NEAL M., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

Lacey A., Appellant,

v.

State of Alaska, Department of Health and Social Services, Office of Children's Services, Appellee.

Nos. S–13288, S–13289.

Supreme Court of Alaska.

Aug. 5, 2009.

---

Angela Greene, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Neal M.

Robert Breckberg, Assistant Public Advocate, and Rachel Levitt, Office of Public Advocacy, Anchorage, for Lacey A. Megan R. Webb, Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee. Jerald M. Reichlin, Fortier & Mikko, P.C., for Native Village of Pilot Point. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, Guardian Ad Litem.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Lacey A. and Neal M. are the parents of six minor children.[1] The superior court terminated their parental rights to the five oldest children after finding that all six children were in need of aid based on Neal's substance abuse and Lacey's neglect. Lacey and Neal appeal only the termination of Lacey's parental rights. Because the superior court did not clearly err in determining that

---

1. Pseudonyms are used for all family members.

the children were in need of aid based on Lacey's neglect and that OCS had made active and reasonable efforts to prevent the breakup of the Indian family, we affirm.

## II. FACTS AND PROCEEDINGS

Lacey A. and Neal M. are the biological parents of six minor children: Edward (born in 1998), Elliot (born in 2000), Eve (born in 2003), Elan (born in 2005), Emma (born in 2007), and Elsa (born in 2008). All six are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2]

Lacey and Neal first had contact with the Office of Children's Services (OCS) in 1998, the year their first child was born. By 2005 OCS had received six reports of harm concerning the children. Those reports were unsubstantiated. But in April 2006 OCS received a new report of harm alleging neglect and substance abuse. An OCS social worker began regular visits with the family in May 2006 and by August 2006 had made about fifteen visits to Lacey and Neal's apartment.

Lacey and Neal had four children when the OCS social worker began visiting their home. The social worker noticed that the couple's then two-and-a-half-year-old daughter, Eve, was not very verbal. The social worker recommended that Neal and Lacey enroll Eve in Head Start, but they refused. The social worker also tried to get Programs for Infants and Children, Inc. (PIC) to perform an in-home assessment. The social worker later testified that Neal gave the PIC staff a "really hard time" about scheduling and that PIC was never able to get into the family home.

The social worker also learned that the two oldest children were not getting to school on time and had accrued about seventy-nine absences during one school year because Neal was oversleeping. Neal claimed that the children were missing school because they did not have clean laundry. The social worker took Lacey to Pathway Families to get free clothes for the children. The children's school gave the family an alarm clock and wake-up calls, but the social worker later testified that the school's efforts did not help.

The social worker also transported Lacey to a job center, helped her complete a resume, helped enroll her with her tribe so she could receive free medical services, arranged bus passes and taxi service for the family, and contacted Alaska Housing Finance Corporation about possible housing assistance.

On August 18, 2006, the social worker conducted a mid-morning unscheduled home visit. A woman identifying herself as a friend of the family opened the door. Entering, the social worker found Lacey and the children asleep and a group of six or seven unknown adults "smoking something other than cigarettes" in one of the bedrooms. The social worker called the police and the unknown individuals quickly left. Upon arriving, a police officer found an empty liquor bottle with a hole burned in the middle and "some type of residue" inside. The officer "wasn't sure if it was marijuana or cocaine."

Neal, who was not then at home, returned to the apartment while the police were there and became angry that Lacey had allowed the police into the home. The social worker testified that she was worried about Lacey's safety because Neal was "in her face yelling at her." The police arrested Neal for failing to comply with his sex offender registration requirements, but Neal returned to the apartment later that day.[3]

The social worker questioned both parents at the time about drug use in the home and asked Neal to complete a drug test. Neal tested positive for cocaine and admitted that he had used drugs at a neighbor's house earlier that day. The social worker asked Lacey to participate in a plan to ensure the children's safety. Under that plan, Neal would move out of the home until August 22, 2006, when the social worker would reevaluate the plan. Lacey agreed that she would not allow Neal—or anyone else who might be a threat to the children—back into the home. Lacey's father, who lived nearby, agreed to care for the children while Lacey was at work.

---

2. 25 U.S.C. § 1903(4) (2006).

3. Neal was convicted of sexual assault in the first degree in 1988. This conviction is unrelated to the present case.

The social worker returned to Lacey's apartment on August 22 to reevaluate the safety plan. Both Lacey and Neal were there. The social worker spoke with both parents about their drug use and Neal admitted he was using drugs. The social worker also spoke with eight-year-old Edward, who reported that Neal had stayed in the apartment over the weekend in violation of the safety plan.

On August 30, 2006, OCS filed an emergency petition to adjudicate Edward, Elliot, Eve, and Elan as children in need of aid, stating that Neal and Lacey "were unable to be protective and assure safety in the home." OCS alleged that Edward told a social worker that Neal often smoked crack with his friends in the bedroom where Edward's toys were, that Edward claimed his dad's friends had been in and out of his house two hundred times and that they had spent the night more than ten times, and that Edward reported feeling unsafe in the house because his parents "let everyone in the house."

OCS placed the children in foster care. A social worker later testified that Edward and Elliot suffered from "a lot of delays" including speech, medical, educational, and social delays.

In September 2006 the superior court granted OCS temporary custody of the four children, concluding that there was probable cause to believe they were children in need of aid based on Neal's substance abuse. Although Lacey and Neal were permitted supervised visitation with the children, OCS claimed that the parents missed three visits in September and arrived at another visit ten minutes before it was to end. The parents allegedly told OCS that they missed the visits because Lacey was sick or at work and Neal was doing laundry. Neal allegedly also stated that it hurt too much to see the children.

In October 2006 Lacey agreed to a new safety plan making her the children's sole care provider. She agreed that Neal would not contact her or the children unless authorized by OCS. Neal and Lacey were given a case plan that reiterated that Lacey should "not allow [Neal] to reside in her home with the children present" and should ensure that the children attend school on time.

The social worker helped Lacey obtain shelter by referring her to Clare House, a thirty-day temporary shelter for homeless women with children. Lacey's four children were placed with her at Clare House in November 2006. Later that month, Lacey moved into an apartment with her children. She completed a Clare House exit plan that indicated she did not wish to receive follow-up services from her Clare House case manager after her discharge.

In December 2006 OCS received a report from a teacher and special education supervisor that Edward and Elliot had stated that Neal was back in the home. A social worker later witnessed Neal leaving the residence. Based on Lacey's violation of the safety plan, OCS again removed the children and placed them in foster care.

In April 2007 Lacey gave birth to Emma, her fifth child with Neal. A social worker created a safety plan calling for Lacey to move into Clare House with Emma when she was discharged from the hospital. Lacey agreed and was admitted to Clare House on April 23. OCS filed a non-emergency petition to adjudicate Emma a child in need of aid.

Lacey completed parenting classes on May 10. But an OCS social worker later testified that Lacey still was not able to demonstrate that she could protect her children. The social worker then referred Lacey for counseling at Southcentral Foundation.

On May 24, 2007, Clare House staff discovered that Lacey had been meeting her "boyfriend" on the bus and giving him food from the center. Emma was reportedly present at the time. Four days later Clare House staff caught Lacey taking food out of Clare House in a coat-covered stroller. Lacey later admitted that she was attempting to take the food to Neal.

On May 31, 2007, Lacey's case manager at Clare House wrote a discharge letter for Lacey. It indicated that the reason for the discharge was "space limitations" and the fact that Lacey was not eligible for an extension. An OCS social worker stated in an

affidavit that she was told Lacey was being asked to leave due to her non-compliance with the rules at Clare House. OCS obtained an order authorizing OCS to remove Emma from Lacey's custody after Lacey reportedly disclosed that she could not think of any place to go where Emma would be safe. OCS took Emma into custody on June 1.

Lacey moved to Glenallen and began living with Neal in June 2007. It was about this time that Lacey became pregnant with her sixth child, Elsa. On July 2, 2007, OCS placed the five children with Lacey's maternal uncle in Pilot Point. OCS arranged for Lacey to stay with another uncle in the same village. A social worker flew out with the children and Lacey and provided them with food and other necessities, such as clothing and beds.

When she moved to Pilot Point, Lacey had not yet begun the counseling sessions OCS required. But a social worker testified that she referred Lacey to a family service worker in Pilot Point who was willing to meet with Lacey for counseling sessions.

Lacey testified telephonically at a mid-July disposition hearing that she had met with the family service worker and was told that counseling would begin after the worker returned from a two-week vacation. Lacey also testified that if she had to choose between Neal and her children, she "would choose [her] kids" and that she "can't stand being without them." She testified that she would not let Neal have contact with their children without scheduled visits and that she would turn him in to the local police if he showed up in Pilot Point.

Lacey never began therapy in Pilot Point. She later testified that she was unable to get counseling in Pilot Point because "they [didn't] have qualified people down there." In October 2007 Lacey moved back to Anchorage without telling OCS. Her children remained in Pilot Point. Lacey testified that she moved because she had "no housing down there." She told a licensed clinical psychologist that she left Pilot Point "because they have brown water sometimes I went without electricity and water in the house, sometimes no propane." Lacey also allegedly told the psychologist that she left Pilot Point to get an ultrasound.

After returning to Anchorage, Lacey began counseling at Southcentral Foundation in November 2007 in an attempt to comply with her OCS case plan. During her intake assessment, Lacey indicated that she was living with Neal, whom she described as her fiancé, and described their relationship as "excellent." Although she acknowledged that OCS did not want the children to live with Neal, Lacey allegedly stated that she intended to continue living with Neal even after she received custody. The intake counselor determined that Lacey needed parenting techniques to regain custody. The counselor indicated that Lacey's prognosis with treatment was good, even though she recognized that Lacey's attitude towards treatment as an OCS-imposed requirement might become a barrier to treatment. The counselor recommended that Lacey participate in individual therapy.

Meanwhile, Neal continued to struggle with substance abuse. Of the eleven urinalysis appointments he had in November 2007, he failed to show up for seven and tested positive for cocaine at the other four. Salvation Army Clitheroe Center had performed a substance abuse assessment on Neal in July 2007 and observed that Neal "demonstrated a lack of awareness and understanding regarding addiction and would benefit from receiving substance abuse treatment." Although Neal was "not appropriate for treatment" at Clitheroe, the counselor who evaluated Neal recommended that he seek treatment at a facility like Akeela House that could address his "history of criminality, antisocial behavior/traits, denial, and thinking errors." There is no evidence Neal participated in the recommended treatment.

In December 2007 OCS petitioned the superior court to terminate Lacey and Neal's parental rights as to the five oldest children. OCS alleged that Neal had not addressed his problems with substance abuse, neglect of the children, and anger management; OCS also alleged that Lacey "continues to be unable or unwilling to protect the children from [Neal]."

In February 2008 Lacey gave birth to Elsa, her sixth child with Neal. OCS assumed temporary custody of Elsa. An OCS social worker later testified that she had given Lacey the option of returning to Pilot Point after OCS assumed custody of Elsa but that Lacey "wasn't willing to go."

Although Lacey later testified that she and Neal had broken up a couple weeks before Elsa was born, the record indicates they were still associating after Elsa's birth. The superior court observed that the return of service on the petition OCS filed to adjudicate Elsa as a child in need of aid showed that Lacey and Neal were both at Bean's Café on March 10, 2008 when they were served. And Neal described Lacey as his fiancée during a March 21 intake assessment.

A probable cause hearing for Elsa was held on February 29, 2008. The superior court held that there was probable cause to find that Elsa was a child in need of aid and that removal was warranted for the same reasons that justified removing the five older children. The court asked an OCS social worker to articulate her expectations for Lacey and Neal. The social worker explained that OCS would ask Lacey to abstain from having a relationship with Neal if he continued to be non-compliant with his case plan. She stated that her goal for Lacey was to get her "really active in her therapy" in order to help her overcome her dependency on Neal and realize that leaving Neal was "a decision that [Lacey] will have to make."

Lacey continued to receive counseling through May 2008 and completed the eight sessions OCS required plus three additional sessions. An OCS social worker observed that Lacey began to show some progress around May 2008 when she claimed that she would discontinue contact with Neal, move back to Pilot Point, and get her children back. But the social worker later testified that Lacey never followed through on those intentions.

In June 2008 Neal was driving Lacey's car when the police stopped him because of a defective headlight. Neal, who had a suspended license and two outstanding warrants, was arrested and taken to the Anchorage Correctional Complex. Lacey visited Neal nine times between June 4 and June 14 and identified herself as Neal's fiancée during her visits. Lacey testified at a June 20 placement review hearing that she self-identified as Neal's fiancée just so she wouldn't "have to go through a lot of talk." Lacey testified that she and Neal were no longer involved and that they had not lived together since February 2008. But in mid-July 2008 Lacey posted Neal's fifty-dollar bail after he was charged with vehicle tampering.

A three-day termination trial was held in August 2008. Neal testified at the trial and admitted that he continued to use cocaine and that, despite seeking treatment on a number of occasions, he had failed to complete his treatment plan.

Dr. Melinda Glass, a clinical psychologist who evaluated Lacey in June and July 2008, testified as an expert witness at the termination trial. Dr. Glass testified that she did not believe Lacey would keep her children away from Neal or that she would discontinue her relationship with him. Dr. Glass testified that, although Lacey had stated that she was willing to do anything to get her children back, Lacey had not demonstrated any such willingness on a "concrete level."

The superior court concluded that there was clear and convincing evidence that all six children were children in need of aid based on Neal's substance abuse and Lacey's neglect. The court found that:

> [Lacey] has engaged in conduct that subjects the children or has subjected the children in this household to neglect, and the neglect is not so much of neglect as a parent but neglect in the way of being unable or unwilling to prevent [Neal] ... from being around the children.

The court found that it was unlikely that the children could be returned to Lacey within a reasonable time because she had chosen to be involved with Neal and would likely continue to be involved with him in the foreseeable future.[4]

4. Clare House's records, which were admitted into evidence at Lacey's disposition hearing, indicate that Lacey had previously stayed at the facility in December 2005. The superior court

The court also concluded that there was clear and convincing evidence that OCS had made active and reasonable efforts to reunify the family, which proved unsuccessful. As to Lacey, the court noted that providing the Clare House services and sending Lacey and the children to Pilot Point where they would be separated from Neal was sufficient to meet the statutory standard. The court accordingly terminated Lacey and Neal's parental rights to their five eldest children and adjudicated the youngest child, Elsa, as a child in need of aid.

Lacey appeals the termination of her parental rights. Neal joins in Lacey's appeal but does not argue that the superior court erred by terminating his parental rights.

## III. DISCUSSION

### A. Standard of Review

 Whether the superior court's factual findings comport with ICWA and are sufficient to support termination of parental rights under the Child in Need of Aid (CINA) statutes and rules are questions of law that we review applying our independent

judgment.[5] Whether the state has complied with ICWA's "active efforts" requirement presents a mixed question of law and fact.[6]

 We "will reverse the factual findings of the superior court in a termination of parental rights case only when those findings are clearly erroneous."[7] This standard "is met only if we are left with a definite and firm conviction that a mistake has been made after review of the entire record."[8] In reviewing a superior court's determination to terminate parental rights, we "bear in mind at all times that terminating parental rights is a drastic measure."[9]

### B. Were the Children in Need of Aid in Part Because of Lacey's Neglect?

Lacey argues that the superior court erred in concluding that her children were in need of aid based on her neglect. She contends that she did everything that OCS required of her by completing parenting classes, attending counseling sessions, and recognizing that Neal could not be around her or the children until he resolved his drug problem.[10]

noted that there were reports in Lacey's file from her past stays that tended to show her inability to supervise her children on her own. Staff members documented one instance in which Lacey was sleeping on the floor with one child while Eve, then two-years old, was "running wild" around the room after pulling off her diaper and urinating on the floor. Elan, about two months old at the time, was lying in her basinet with a wet diaper and spit-up running down her mouth. Clare House staff remarked that Lacey "seem[ed] to have no clue what to do with her kids." Another time, one of Lacey's children pushed open an emergency exit door "due to lack of supervision." The superior court relied on these staff reports in finding that Lacey "was unable to adequately supervise the children in the sheltered environment of Clare House." The court used this finding as support for its failure-to-remedy analysis, which Lacey does not seem to contest on appeal.

**5.** *Rick P. v. State, OCS,* 109 P.3d 950, 954–55 (Alaska 2005) (CINA); *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000) (ICWA); *see also Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 79 P.3d 50, 53 (Alaska 2003) (explaining that when engaging in de novo review, this court adopts "the rule of law that is most persuasive in light of precedent, reason, and policy" (citing *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979))).

**6.** *J.S. v. State,* 50 P.3d 388, 391 (Alaska 2002) (citing *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 259 (Alaska 1999)).

**7.** *Martin N.,* 79 P.3d at 53 ("When reviewing factual findings, '[this court views] the evidence in the light most favorable to the party prevailing below.'" (quoting *In re J.L.F. & K.W.F.,* 828 P.2d 166, 170 n. 12 (Alaska 1992), *superseded on other grounds by statute,* ch. 99, § 1, SLA 1998)).

**8.** *Id.* (internal citation omitted).

**9.** *Karrie B. ex rel. Reep v. Catherine J.,* 181 P.3d 177, 184 (Alaska 2008) (internal quotation marks omitted) (quoting *Martin N.,* 79 P.3d at 53).

**10.** To terminate parental rights to Indian children, the superior court must find: (1) by clear and convincing evidence that "the child has been subjected to conduct or conditions described in AS 47.10.011"; (2) by clear and convincing evidence that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm," or "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child at substantial risk of physical or mental injury"; (3) by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to

The superior court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to "conduct by or conditions created by the parent, guardian, or custodian [that] have subjected the child or another child in the same household to neglect." [11] The court may find neglect if the parent

> fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so. [12]

The superior court found clear and convincing evidence that Lacey and Neal's children were in need of aid based in part on conditions created by Lacey and Neal that had subjected the children to neglect. The court based this finding on evidence that: (1) Edward and Elliot missed almost eighty days of school during the 2005–2006 school year, reportedly because the parents overslept; (2) on August 18, 2006, Neal tested positive for cocaine after an OCS social worker found six to seven unknown adults "smoking something other than cigarettes" in the apartment while the children were home; (3) the parents missed visits with the children after OCS assumed custody; and (4) Edward, Elliot, and Eve suffered from significant delays in speech and verbal skills and required dental care when they entered state custody in 2006.

Lacey does not argue that these findings were clearly erroneous, and each is amply supported by the evidence discussed in Part II, above.

Moreover, evidence discussed in Part II concerning the August 18, 2006 family-home incident raises grave doubts about Lacey's ability to provide the care and control needed for her children's physical and mental health and development.

In *Audrey H. v. State, Office of Children's Services,* we stated that the superior court, when determining whether the child has suffered from neglect, may consider a child's exposure to drug use. [13] We held that the superior court did not err by concluding that the mother had failed to provide her children with the care and control necessary for their mental health and development, in part because she exposed her children to illegal drug use and open sexual activity. [14]

The August 18, 2006 incident similarly demonstrates that Lacey failed, on at least one occasion, to provide the care and control necessary for her children's health and development. Lacey may not have invited the individuals into her home to engage in what was likely illicit drug use, but she seemed unable (or unwilling) to prevent the occurrence from happening.

Lacey's arguments that she complied with her case plan and admitted that Neal had a drug abuse problem have little bearing on the children-in-need-of-aid finding.

■ We conclude, as OCS argues, that there was more than sufficient evidence to demonstrate that Lacey and Neal's children were children in need of aid based on neglect, that the evidence demonstrates that Lacey failed to provide the children with adequate education, medical attention, or other care and control necessary for their physical and mental health and development,

---

prevent the breakup of the Indian family and that these efforts have proved unsuccessful"; (4) by evidence beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child; and (5) by a preponderance of the evidence that termination of parental rights is in the best interests of the child. 25 U.S.C. § 1912(d), (f) (2006); AS 47.10.088; CINA Rule 18(c); *Maisy W. v. State, ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1268 (Alaska 2008); *Gilbert M. v. State,* 139 P.3d 581, 589–90 (Alaska 2006); *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 102

P.3d 932, 935 (Alaska 2004). The superior court here addressed all five requirements. Lacey's appeal challenges only the first and the third required findings as listed here.

**11.** AS 47.10.011(9).

**12.** AS 47.10.014.

**13.** *Audrey H. v. State, Office of Children's Servs.,* 188 P.3d 668, 675 (Alaska 2008).

**14.** *Id.* at 675.

and that the superior court correctly concluded that Lacey's inability or unwillingness to prevent Neal from being around the children amounted to neglect. The record contains ample evidence supporting the superior court's finding by clear and convincing evidence that all six children were in need of aid based in part on Lacey's neglect.

Lacey also challenges particular evidence bearing on the court's child-in-need-of-aid finding. She argues that Dr. Glass improperly based her opinion of Lacey's parenting ability on Lacey's decision to leave Pilot Point and return to Anchorage without her children. Dr. Glass testified that Lacey's decision to leave her children in Pilot Point demonstrated that, despite her stated willingness to do anything to get her children back, Lacey had not historically done what it would take to regain custody. On cross-examination, Dr. Glass acknowledged that Lacey claimed she left Pilot Point to obtain counseling services that she could not get in the village. But Dr. Glass then testified that, even if Lacey was faced with "competing" case plan requirements, she should have discussed with OCS which requirement was to have priority.

Lacey asserts that she left Pilot Point only because she could not obtain counseling services there. She argues, at least implicitly, that she moved back to Anchorage to complete her case plan requirements. She contends that it is not fair to place her in a "Catch 22 situation," in which her attempts to comply with OCS's requirements help support the termination of her parental rights. She accordingly asks that the termination be reversed and that on remand her decision to return to Anchorage not be used to support terminating her parental rights.

The superior court did not expressly mention Lacey's decision to leave Pilot Point in 2007 when it determined that the children were still in need of aid. But it seems to have considered this fact in its active efforts analysis, and noted that OCS had attempted to create a physical separation between Lacey and Neal by relocating Lacey and her children to Pilot Point. It then found that Lacey "chose to return to Anchorage in October 2007 rather than reside near the children."

It was not error to allow OCS to elicit evidence that Lacey left Pilot Point to return to Anchorage in 2007, and it appears OCS is correct in arguing that Lacey did not object to Dr. Glass's testimony in this regard. Even assuming Lacey relocated to get OCS-mandated counseling, there was a valid dispute whether, as Dr. Glass also testified, Lacey should have sought clarification from OCS before moving back to Anchorage.

Moreover, there was conflicting evidence about why Lacey returned to Anchorage. She claimed she left to complete a counseling requirement that could not be satisfied in Pilot Point, but there was evidence permitting a contrary finding. An OCS social worker testified that she referred Lacey to a family service worker in Pilot Point who was willing to meet with Lacey for counseling. Lacey testified in mid-July that she met with the family service worker and was told that her counseling would begin after the family service worker returned from a two-week vacation. And when she was asked at a placement review hearing why she moved back to Anchorage, Lacey testified: "Because I have no housing down there and I was looking for housing down here." She later told Dr. Glass that she left Pilot Point because she needed an ultrasound and "because they have brown water sometimes I went without electricity and water in the house, sometimes no propane."

This conflicting evidence raised credibility disputes to be resolved by the superior court. The court appears to have weighed Lacey's decision to relocate from Pilot Point against her. The record provides support for the implicit finding that Lacey's decision to leave Pilot Point was inappropriate.

### C. Was There Clear and Convincing Evidence OCS Made Active and Reasonable Efforts To Prevent the Breakup of the Indian Family?

█ Lacey argues that the superior court erred in finding that OCS made active and reasonable efforts to prevent the breakup of the Indian family. She contends that the court's active-and-reasonable-effort analysis

ended when OCS relocated her to Pilot Point, and that the findings do not reflect that OCS "effectively abandoned" her after the relocation. Lacey appears to argue that OCS should have, first, determined whether there was any additional treatment available in Anchorage that would benefit her and, second, provided her with any such treatment.

ICWA requires that before a court may terminate parental rights, it must find by clear and convincing evidence "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [15] We have held that "no pat formula exists for distinguishing between active and passive efforts" and have adopted a case-by-case approach for active efforts analysis.[16] We have nevertheless recognized the following distinction between active and passive efforts:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[17]

■ In evaluating whether the state met its active efforts burden, the court may consider "a parent's demonstrated lack of willingness to participate in treatment." [18] Courts also look "to the state's involvement in its entirety." [19] In *Maisy W. v. State, Department of Health & Social Services, Office of Children's Services,* we affirmed a termination even though the state conceded it had not made active efforts during a three-month period.[20] We concluded that the entirety of the state's efforts after it first became involved met the active efforts requirement.[21] We similarly held in *E.A. v. State, Division of Family & Youth Services* that the state's failure to make active efforts during one seven-month period was "insignificant in light of the extensive remedial efforts the state has provided throughout its involvement." [22]

The superior court here concluded that there was clear and convincing evidence that OCS made active and reasonable efforts to prevent the breakup of the Indian family. In support, the court made these findings:

a. [An OCS social worker] offered assistance to the family between May and August 2006 by providing wake-up calls, an alarm clock, transportation, assistance with benefits, food, diapers, household goods, bus pass, PIC referral, Head Start referral, and job applications.

b. A Care and Safety Plan was signed by the parents on August 18, 2006, which required [Neal] to leave the home so the children could remain in the home with [Lacey]. The plan failed because [Neal] returned to the home.

c. [Neal] was referred to urinalysis.

d. [Neal] was referred to Clitheroe for a substance abuse assessment. He com-

---

**15.** 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B).

**16.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks omitted) (citing *A.M. v. State,* 945 P.2d 296, 306 & n. 12 (Alaska 1997)).

**17.** *Id.* at 261 (quoting Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984)).

**18.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263,

1268 (Alaska 2008) (quoting *N.A. v. State, DFYS,* 19 P.3d 597, 603 (Alaska 2001)).

**19.** *Id.* at 1268.

**20.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1269 (Alaska 2008).

**21.** *Id.* at 1269.

**22.** *E.A. v. State, Div. of Family & Youth Servs.,* 46 P.3d 986, 990 (Alaska 2002).

pleted an assessment on July 27, 2007. He was diagnosed as cocaine abuse/rule out cocaine dependent and recommended for treatment.

e. The children were placed with [Lacey] at Clare House on November 3, 2006. [Lacey] obtained housing for herself and the children as part of a second trial home visit. The plan failed because [Neal] returned to the home.

f. [Neal] completed a mental health assessment with [a licensed marriage and family therapist].

g. [Neal] attended some anger management classes at Southcentral Foundation's Fathers Journey Program.

h. [Elsa] was placed with [Lacey] at Clare House on April 21, 2007.

i. [Lacey] attended counseling at Southcentral Foundation between November 2007 and May 2008. [Lacey] reported that she did not see the need for treatment and was only attending to get her children back. In November 2007, [Lacey] reported that when she regained custody of her children, she would reside with the children's father.

j. Both parents attended parenting classes. Lacey completed a parenting class at Alaska Youth and Family Network (AYFN).

k. [Neal] attended substance abuse assessments at Clitheroe and Cook Inlet Tribal Council (CITC) Recovery Services. In March 2008, CITC diagnosed him as cocaine dependent and recommended intensive outpatient treatment, but [Neal] did not participate in treatment.

l. In July 2007, the children were placed with relatives in Pilot Point. [Lacey] was allowed to reside in Pilot Point and have unlimited contact with the children. The department created a physical separation between [Lacey] and [Neal], but [Lacey] chose to return to Anchorage in October 2007 rather than reside near the children. She reunited with [Neal].

(Internal citations omitted.)

Lacey does not argue that these findings are clearly erroneous. Contrary to her argument that the superior court's analysis ended when OCS relocated her to Pilot Point, the court's findings note that Lacey received counseling at Southcentral Foundation through May 2008, after she left Pilot Point. OCS also resolved disputes between Lacey and the foster family in Pilot Point and paid for Lacey and the children to remain in telephonic contact after Lacey returned to Anchorage.

OCS's involvement with Lacey and Neal from May 2006 until May 2008 demonstrates that OCS did not expect them to satisfy the case plan without assistance. Although OCS expected Lacey to become a more protective parent and to learn to appreciate the dangers of Neal's drug abuse, OCS attempted to help her develop the skills and mental resolve to accomplish those things through parenting classes and counseling sessions.

The superior court found that these efforts were unsuccessful. It noted that Lacey and Neal "remain together despite [Lacey's] assertions to the contrary," and that Lacey continued to be "unable or unwilling to parent the children without [Neal] in the home." The court further found, after relying on Dr. Glass's testimony, that Lacey "does not perceive any danger to the children related to the home conditions or parenting" and has no desire to change.

Looking at the "totality of the efforts made," we agree with OCS and hold that the superior court did not err in concluding that OCS made active efforts to identify and provide remedial services that ultimately happened to be unsuccessful. We also hold, as OCS contends, that OCS did not abandon Lacey but continued to make ongoing efforts through the summer of 2008 by identifying a mental health services provider in the village, communicating with Lacey's counselors in Anchorage, and ensuring that Lacey kept in telephonic contact with her five oldest children even after she left Pilot Point.[23]

23. The Native Village of Pilot Point filed a notice joining in the arguments made in OCS's brief of appellee.

We therefore conclude that the superior court did not err in holding that OCS's efforts were active and reasonable.

## IV. CONCLUSION

For these reasons, we AFFIRM the termination of Lacey's parental rights.