NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CLARICE M., | ) |
| | ) Supreme Court Nos. S-17151/17153 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court Nos. 3AN-10-00231/ |
| | ) 3AN-14-00014 CN |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) MEMORANDUM OPINION |
| | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 1723 – May 29, 2019 |
| | ) |
| PERRY S., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Elizabeth W. Fleming, Kodiak, for Appellant Clarice M. Chris Peloso, Juneau, for Appellant Perry S. Mary Ann Lundquist, Senior Assistant Attorney General,

---

\*      Entered under Alaska Appellate Rule 214.

Fairbanks, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A mother with longstanding mental health issues left Alaska with her daughter while the Office of Children's Services (OCS) was petitioning for the daughter's custody. The mother gave birth to another daughter in California, where the family — including the second daughter's father — was apprehended about three years later. Returned to Alaska, the two girls were found to be suffering from serious mental health problems, and the mother, father, and daughters all underwent therapy for several years before OCS petitioned to terminate parental rights. The superior court granted the petition following trial, finding that the parents were unable or unwilling to acknowledge the seriousness of both the mother's and the two daughters' mental health issues and their need for continued treatment.

Both parents appeal. The mother argues that the superior court deprived her of due process by conditioning her right to parent on her agreement to take psychiatric medications. The father argues that the superior court clearly erred by finding that his daughter was a child in need of aid as a result of his conduct or that he failed to remedy the conduct. Both parents also argue that the superior court clearly erred by finding that OCS made reasonable efforts to reunite the family. Because we conclude that the superior court did not violate the mother's due process rights and that its findings were not clearly erroneous, we affirm.

## II.   FACTS AND PROCEEDINGS

### A.   Background:  Flight And Return

Clarice's daughter Sierra was born in January 2006.[1]  In late August 2010 OCS moved for custody of Sierra based on allegations of abandonment, risk of mental injury, neglect, and parental mental illness, and two weeks later the superior court granted OCS temporary custody.   In the meantime, however, Clarice — then nine months pregnant — flew to California, claiming a family emergency and taking Sierra with her.  According to OCS, Clarice then "essentially [went] into hiding." In September Clarice gave birth to Zelda, whose father is Perry S.[2]   This case involves Clarice's parental rights to both her daughters, Sierra and Zelda, and Perry's parental rights to Zelda.

California officials found Clarice and Perry in November 2013, living out of a van with the two girls and Clarice's boyfriend Shane.  Since 2010 Clarice and her daughters had lived in motels in Nevada and California and spent time with relatives. Perry was visiting them when they were apprehended; he told a caseworker with the California Department of Children and Family Services that he had been sending money to help support the family for over a year.   The caseworker described her initial encounters with the family:  Sierra "appeared dirty and worn," Zelda was "distressed and unconsolable [sic]," and Clarice believed that Sierra had been sexually abused.  The caseworker reported that the girls' behavior indicated "very little standard of living, structure and sense of value."

An Alaska OCS caseworker traveled to Los Angeles to take custody of Sierra.  Clarice was extradited to Alaska on charges of felony custodial interference, and

---

[1]     We use pseudonyms for the parties and children to protect their privacy.

[2]     Sierra has a different father, who is not involved in these proceedings.

Perry returned to Alaska of his own volition. Although Alaska was not Zelda's home state, California authorities determined that Alaska was the more appropriate forum for adjudicating her status; she was therefore sent to Alaska following entry of an adjudication order, and OCS placed her in foster care.

**B.      The Children's Condition And Challenges**

It was immediately evident that both children had serious mental health problems. Sierra was placed in a foster home in November 2013 but was removed soon thereafter and admitted to North Star Behavioral Health Facility. She was found to exhibit "mood swings resulting in suicidal and self-harm ideations," "oppositional and non-compliant behaviors," and "difficulty making healthy attachments with caregivers . . . due to her experience of physical and sexual abuse, neglect, and inconsistent parental support." Her diagnoses included post-traumatic stress disorder (PTSD) and "mild mental retardation." Most notably, she exhibited multiple "parts," speaking in different tones of voice and exhibiting different personalities that ranged from babyish to violent.

On her discharge from North Star, Sierra moved into a therapeutic foster home, where she required constant supervision. She received therapeutic services and attended special education classes at school. But she was again removed from the home and admitted to North Star after she choked her sister Zelda while in a different personality and attempted to smuggle a knife to school; there was a boy she did not like and "she was going to get him."

Discharged again from North Star in June 2016, Sierra was placed in a new therapeutic foster home. She was again under constant supervision to avoid self-harming or destructive behaviors. She continued to exhibit multiple "parts" or personalities, switching parts more frequently when stressed.

Sierra's therapists testified at the termination trial that she was developing coping skills and that therapy was helping her manage her different personalities. Her

clinical therapist testified, however, that Sierra was likely to need "trauma-focused therapy for a long time," likely "into adulthood." She described what would be "required of a caregiver to provide both physically and emotionally safe care to [Sierra]": a commitment to continue the long process of trauma-focused therapy; an understanding of Sierra's complex physical and mental health needs, particularly how some of her "behaviors are a manifestation of her trauma" rather than "willful behaviors"; the ability to provide "a high level . . . of supervision," "a deep level of empathy," and consistent and controlled responses "whenever [Sierra] does something wrong"; and the ability to support a routine, advocate for Sierra's specialized academic needs, be a good role model, and teach socialization skills. The clinical therapist concluded that "without a support network that possessed these skills," Sierra would likely "decompensate, she would lose the gains that she's already made, . . . create more parts" to deal with the stress, and "likely display more at-risk behaviors as well."

Sierra's sister Zelda was three years old when she was sent from California to Alaska in February 2013. Her first foster mother testified at the adjudication trial that Zelda at first worried about having enough money to buy water, was afraid she would be left alone in the car, and expressed a fear of Shane, her mother's boyfriend. After a few months she was moved to the therapeutic foster home where Sierra was staying so the two girls could be together.

At the termination trial, the new foster mother described the issues Zelda faced when first coming into her care. Zelda "didn't talk much," "didn't eat very much," and was not toilet-trained. When she did not get her way she responded with self-harming behaviors such as throwing herself down flights of stairs. Like Sierra, Zelda had a hard time communicating her feelings and identifying safe adults.

Zelda was diagnosed with PTSD; she struggled academically and with socialization skills. She sometimes experienced disassociative episodes during which

she stared at a wall and was "unreachable." She received individual therapy, group therapy, and therapeutic socialization services to work through symptoms related to these diagnoses and challenges. By the time of trial she had been in the same foster mother's care for four years and, with the advice of her therapeutic team, was developing better communication and coping skills. She received family therapy with Clarice and Perry, who attended regularly and were gentle with her. According to the family counselor, however, Zelda was "increasingly resistant to any contact, in particular with [Perry]." She would refuse to enter the room if Perry was there; she claimed he had "hit her and that he yelled at her mother." Finding the visits "counter-therapeutic and harmful," the counselor paused them.

Zelda's clinical therapist also testified at the termination trial. She described the kind of caregiver necessary "to provide physically and emotionally safe care for" Zelda in the same terms as Sierra's therapist: highly informed, empathetic, committed to structure and routine, and able to model basic life skills. Absent these qualities in her caregiver, Zelda could show "an increase in her trauma responses" and regression in other areas in which she had made significant progress.

### C. The Parents' Progress

OCS offered the parents a number of services in addition to those offered the girls, including parenting classes, anger management classes, and bi-weekly visitation. But the major concerns OCS identified for the family involved both parents' mental health and Clarice's possible substance abuse. Clarice received a psychological evaluation in 2014. The evaluator opined that she was a "neglective child perpetrator probable" and diagnosed her as suffering from "schizoaffective disorder-bipolar type [and] borderline intellectual functioning." The evaluator also recommended that Clarice's treating professionals consider whether she had "borderline personality disorder." The evaluator made note of a "thought disorder," which covered symptoms

such as "delusions, hallucinations, disorganized speech, [and] disorganized behavior," combined with a "mood disorder," indicated by "labile affect, emotional discontrol, emotional disregulation, [and] a high degree of irritability." The evaluator recommended dialectical behavioral therapy (DBT) and medication. Clarice participated fully in the recommended DBT, but as of 2016 she was still unwilling to acknowledge the full diagnosis of her mental illness or accept recommended medication.

Perry was referred for a neuropsychological evaluation in April 2014 and diagnosed with Disruptive Mood Dysregulation Disorder; the neuropsychologist also noted that Perry "is loyal to his child's mother and will not see the consequences of her parenting skills on his child." The neuropsychologist recommended individual therapy, greater access to visitation, parenting classes, and education about Clarice's illness. From November 2014 until the termination trial Perry met individually with a therapist, who also provided Perry and Clarice couples counseling for a few years. The therapist testified at the termination trial that Perry would be "an adequate parent," that Perry had acknowledged the severity of Clarice's mental illness, and that Perry would be protective of Zelda if Clarice's mental health reached a crisis point. The therapist acknowledged, however, that he had never met Zelda and had fairly limited information about her needs.

The family's last OCS caseworker, who also testified at the termination trial, was more pessimistic about the family's future. He testified that he did not believe Clarice had improved substantially, as, within the preceding eight months, she appeared to be "shopping" for service providers who would tell her what she wanted to hear; she could not articulate her daughters' needs; she said she did not believe in being on medication; and she did not agree with her daughters' diagnoses or that their issues were mental-health-related. The caseworker testified that Perry, too, could not articulate his daughter's needs; instead, Perry "explained . . . that people are trying to say that his daughter is crazy, [but] he doesn't believe that that is the case." The caseworker was also

concerned that Perry, while admitting that Clarice was sometimes moody, could not articulate a plan for taking care of the children if she was having an off day, but instead said that Clarice "would be able to handle it, it wouldn't be that big of a deal." Ultimately, the caseworker concluded that neither parent truly acknowledged Clarice's mental health issues, and he recommended adoption for Zelda and guardianship for Sierra.

### D. Termination Proceedings And Order

The termination trial spanned five days in February and March 2018, and the superior court entered extensive findings on the record in June. The court found that OCS proved by clear and convincing evidence that Clarice and Perry subjected Sierra and Zelda to conduct that made them children in need of aid under AS 47.10.011(8)(A) (mental injury to the children), (9) (neglect), and (11) (parental mental illness). The court found that Clarice and Perry, despite their engagement with therapy, had not remedied this conduct within a reasonable time and that returning the girls to their care would result in "severe mental injury and perhaps physical injury." The court found that OCS's efforts over the course of the case had been "timely and reasonable, and really quite extensive." Finally, the court found that it was in the girls' best interests to terminate Clarice and Perry's parental rights.[3]

Both parents appeal. Clarice argues that the superior court denied her due process by requiring her to take psychiatric medications as a condition of exercising her fundamental right to parent her children; she also challenges some of the court's factual findings. Perry argues that the court clearly erred by finding that he subjected Zelda to conditions or conduct that caused her to be a child in need of aid and by finding that he

---

[3] We commend the superior court judge on the thoroughness of her oral findings.

failed to remedy the conditions or conduct. Both parents challenge the court's finding that OCS made reasonable efforts to reunite their family.

## III. STANDARDS OF REVIEW

We review the superior court's findings of fact in child in need of aid cases for clear error, which we find only if a review of the entire record leaves us with "a definite and firm conviction" that the superior court made a mistake.[4] Conflicting evidence is usually insufficient for us to find clear error, and we will not reweigh the evidence as long as the record provides "clear support for the superior court's ruling."[5] However, whether the factual findings satisfy the CINA statute is a question of law we review de novo.[6] Findings on whether a parent caused the conduct or conditions that led the child to be in need of aid and whether the parent has remedied that conduct or conditions are both factual findings reviewed for clear error.[7]

" 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.' For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[8]

---

[4] *Maisy W. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[5] *Id.*

[6] *Brynna B.*, 88 P.3d at 529.

[7] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013)*; Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

[8] *Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016)).

"Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[9] Whether a party's due process rights have been violated is a question of law we consider de novo.[10]

## IV.   DISCUSSION

### A.   The Termination Proceedings Did Not Violate Clarice's Due Process Rights.

Clarice first argues that OCS denied her due process by conditioning her fundamental right to the care and custody of her children on her willingness to take psychotropic medications. She points out that because the Alaska Constitution is highly protective of individual liberty and privacy, and because the use of psychotropic medication is "potentially devastating," we have imposed a heavy burden on the State to demonstrate that such medication may be administered over a patient's objection.[11] Clarice contends that OCS subverted the constitutionally mandated procedure for involuntary medication by "forc[ing] the removal of [her] children because she refused to take psychiatric medication."

We reject the factual premise of this argument. The superior court did not terminate Clarice's parental rights because she refused to be medicated. The court discussed medication in the context of the required finding that the parent "failed, within a reasonable time, to remedy the conduct or conditions in the home that place[d] the child in substantial risk so that returning the child to the parent would place the child at

---

[9]     *Barbara P.*, 234 P.3d at 1253 (quoting *Brynna B.*, 88 P.3d at 529).

[10]     *Sarah A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 427 P.3d 771, 777-78 (Alaska 2018).

[11]     *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006).

substantial risk of physical or mental injury."[12] Describing "the conduct and beliefs that are the heart of the dangers presented to [Sierra] and [Zelda] when and/or if those children were in [the parents'] care," the court pointed to the parents' failure "to recognize, acknowledge, and appreciate the nature and depth of [Clarice's] mental illness and the impact that that has had and could have in the future on her children." This was particularly serious, in the court's view, given the parents' simultaneous failure "to recognize, acknowledge, and understand the significant mental health needs of [Sierra] and [Zelda], and to demonstrate the ability to meet those needs so that they could safely parent" the two girls. The court returned to this theme repeatedly, finding that Clarice's denial of her "significant mental health issues . . . led her and le[d] these girls to be in the place that they are today"; that Clarice "continues not to recognize and acknowledge her mental illness and the impact that it has on her children"; and that "it is unlikely that [either parent] will be swayed from the positions that they have had which minimize [Clarice's] mental health condition and her needs and the impact of that condition on the girls, and minimize very much the girls' own conditions and unique needs."

It is true that in the course of these remarks the court repeatedly noted Clarice's failure to take prescribed medications. But this was evidence supporting the court's larger point — that Clarice failed to recognize the seriousness of her own mental health issues, thus risking the children's welfare. The court noted a "steady refrain" in Clarice's self-assessment: a refusal "to acknowledge that there's any significant mental health problem, and thus, that she needs to engage with medications *or any particular course of treatment*." (Emphasis added.) The court observed that Clarice's refusal to take prescribed medications was "*consistent with* the Department's position that she does not appreciate that she has a significant mental illness that has directly impacted her

---

[12]     AS 47.10.088(a)(2)(B).

children and would very likely do so in the future." (Emphasis added.) Ultimately, what the court characterized as a failure to remedy was Clarice's continued refusal to recognize in any substantive way the seriousness of her own mental health problems and the impact that had on her children — not simply her refusal to take medications.

Even assuming, as Clarice contends, that her due process rights would be implicated if the superior court were to condition her right to the care and custody of her children on her willingness to take psychiatric medications, we conclude that the superior court did not impose such a condition in this case. There was no due process violation.

**B.     The Superior Court's Factual Findings Were Not Clearly Erroneous.**

Clarice also contends that the superior court clearly erred in the findings supporting termination of her parental rights. She first questions the testifying OCS caseworker's qualifications and "understanding of the history of this case," though she does not identify any particular factual finding this challenge would affect. The superior court expressly recognized Clarice's distrust of the caseworker's testimony and explained its qualified reliance on it: "Although the court certainly understands that the parents may work better with some caseworkers than others, and may not have transitioned well from a prior caseworker . . . , statements to those individuals are nonetheless telling . . . [a]nd are consistent with . . . behavior in the past." We see no clear error in the court's consideration of the caseworker's testimony.

Clarice also argues that the superior court must have erred factually because "Clarice's situation [does not] come anywhere close to that in reported CINA cases . . . , all of which involve significant substance abuse and relapses." Clarice argues that "in this case," in contrast, "there has never been a definitive description of substance abuse applied to Clarice. None whatsoever." But the superior court did not rely on AS 47.10.011(10) — parental substance abuse — to find that Sierra and Zelda were children in need of aid; it relied on three other subsections of the statute. We do not need

to further address Clarice's challenge to a substance abuse finding the superior court did not make.

> **C.     It Was Not Clear Error To Find That Perry Was The Cause Of The Conduct And Conditions That Caused Zelda To Be In Need Of Aid.**

Perry argues that the superior court, in finding his daughter Zelda to be a child in need of aid under AS 47.10.011(8)(A) (mental injury to the child), (9) (neglect), and (11) (parental mental illness), "wrongly conflated its findings against [Clarice] to apply against [him] as well," in particular by relying on evidence of Clarice's mental illness and the neglect the girls suffered in California. In finding CINA status based on parental mental illness, the court found "extensive evidence" that Clarice "suffer[ed] from significant mental health issues" and that her "impairments . . . directly not only contributed to but caused serious mental injury as well as physical injury to these children." These findings were expressly limited to Clarice. But the findings of CINA status based on mental injury to the child and neglect encompassed both parents; we conclude that this was not clear error.

Perry argues that his conduct cannot have been a cause of mental injury to or neglect of Zelda because he "has not had physical custody of [her] at any time in her life," and that while he "did what he could to support [Zelda] from a distance while [Clarice was outside the state and] he remained in Alaska, he was not in a position to dictate the terms of [Zelda's] care." But physical custody is not a prerequisite to a finding of neglect or a finding that the parent created conditions that place the child at risk of harm; these may follow from the parent's failure to intervene when obviously necessary for the child's well-being.[13] The superior court relied on testimony that the

---

[13]     *See, e.g.*, *Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 214 P.3d 284, 291-92 (Alaska 2009) (affirming CINA finding of
(continued...)

two girls were suffering "a nightmarish existence" when OCS first took custody of them, "almost . . . living like wild animals" in "very unsanitary conditions" and suffering mental effects including an "extreme inability . . . to interact socially with other people [and an] inability to speak even close to the level that one would expect of children of those ages." The court found that Perry "was aware of [Clarice's] general state . . . and her inability to provide in very basic and important ways for these girls" but "simply disregarded that" when he allowed her to continue caring for them. The court relied in part on the evidence adduced at the earlier adjudication trial, expressly agreeing with the judge's findings at adjudication that Perry knew Clarice "was not an adequate, able caregiver" for either daughter. Also among the findings made at the adjudication trial were that Perry lived with Clarice for "much of 2010 prior to her absconding from the state," that he "protected . . . or assisted [Clarice] when she absconded from the state" with Sierra, and that he was with her and the children when they were finally located in California three years later.

---

[13] (...continued)
neglect based on children's risk of harm if returned to home where mother was unable or unwilling to prevent father from exposing children to drug use); *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1243-44 (Alaska 2007) (affirming CINA finding based on children's risk of harm if returned to home where father failed to intervene in mother's physical abuse). Relatedly, Perry argues that parents have no "duty to rescue" their children and should not "be forced to essentially become vigilantes and attempt, on their own, to enforce Alaska's criminal custodial interference statute." The evidence in this case showed not just a failure to "rescue" but active support of Clarice's peripatetic and dangerous life with the children. In any event, a "duty to rescue" analysis fits poorly within the CINA context, in which parental neglect is a basis for a CINA finding. AS 47.10.011(9); *cf. Albany Cty. Dep't for Children, Youth & Families v. Ana P.*, 827 N.Y.S.2d 525, 528 (N.Y. Fam. Ct. 2006) ("While in the criminal law and in general tort law there is no duty to rescue, a parent can be charged with neglect or abuse on a failure to protect theory.").

Given this evidence, we conclude that the superior court did not clearly err when it found that conduct by or conditions created by Perry resulted in mental injury to Zelda and subjected her to neglect, leading to her status as a child in need of aid.

**D.      It Was Not Clear Error To Find That Perry Failed To Remedy The Conduct And Conditions That Caused Zelda To Be In Need Of Aid.**

Perry also argues that the superior court erred in finding that he failed to remedy the conduct and conditions that caused Zelda to be a child in need of aid.  He argues that the court gave too little weight to the testimony of his therapist, who testified about Perry's progress in therapy, his acknowledgment of Clarice's mental illness, and his willingness to protect Zelda "if it came to needing that."  Perry contends that, while minimizing his therapist's testimony, the court gave too much weight to the testimony of his OCS caseworker, who, Perry argues, failed to fully educate himself about the case before testifying and had developed an "adverse relationship" with Perry.

As noted above, the court recognized the parents' conflicts with the OCS caseworker while citing his testimony in support of its finding that "[b]oth parents really have a lack of appreciation of the severity of the symptoms and behaviors that [Zelda and Sierra] have been through and exhibited and suffered."  But the court's findings about Perry's failure to remedy this shortcoming relied not just on the caseworker's testimony but also — and primarily — on the testimony of the girls' therapists.  The court noted that the therapists were "working very closely with [the] girls" and had earned their trust, but that Clarice and Perry refused to work with them in family therapy.  The court found that this refusal was "beyond shortsighted . . . [and] really cut off [the parents'] ability to understand, to try further, to understand what their daughters experience and what their needs are."  Recognizing that the parents had done "a great deal of work," the court still found it unlikely they would be "swayed from the positions that they have had which minimize [Clarice's] mental health condition and her needs and the impact of that

condition on the girls, and minimize very much the girls' own conditions and unique needs." The court took account of the more optimistic testimony by Perry's own therapist but noted that he "frankly knows very little about these girls compared to the [girls'] therapists," and ultimately "[t]his is about the girls."

The superior court also relied on the case's time line, noting that "both girls have been in the physical custody of the Department for four years, and [Sierra's] been in the legal custody of the Department for seven years." The court reasoned that because Clarice and Perry had still not remedied the conduct and conditions that made their children in need of aid such that the girls could be returned to their care without risk of mental or physical harm, they had necessarily failed to do so within a reasonable time.

When we review the superior court's factual findings, "[c]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[14] We also defer to the superior court's determination of witness credibility.[15] In finding that Perry still failed to appreciate the seriousness of Clarice's mental health needs and the effect that would have on the girls' own fragile mental health, the court appropriately weighed the array of testimony and based its finding on the evidence. Its finding that Perry failed, within a reasonable time, to remedy the conduct or conditions that made his daughter a child in need of aid was not clearly erroneous.

---

[14] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (internal citations omitted).

[15] *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 8 (Alaska 2003).

**E.** **The Superior Court Did Not Err By Finding That OCS Made Reasonable Efforts To Reunite Clarice And Perry With Their Daughters.**

Perry argues that OCS cannot have made reasonable efforts to reunite the family because he "enthusiastically followed all of the recommendations that OCS made" and still was found lacking as a parent. According to Perry, "it must therefore be presumed that OCS required something more from [him] beyond what they recommended."

"Reasonable efforts" are statutorily defined to include "the duty to . . . identify family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid" and to "actively offer the parent" and "refer the parent . . . to" those services.[16] In determining the reasonableness of the efforts we consider them "in their entirety," and OCS's duty "is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[17] When courts consider this factor in a termination proceeding, thus, the proper focus is on the nature of OCS's efforts, not whether they succeeded.[18] It is unfortunate but true that parents may sometimes do all that is required of them and still fall short of being able to safely parent

---

[16] AS 47.10.086(a)(1)-(2); *see also* AS 47.10.990(29) (defining "reasonable efforts" as "consistent attempts made during a reasonable time period and time-limited services").

[17] *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

[18] *See Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 448 (Alaska 2017) ("[E]ven if the outlook is bleak and the likelihood of success is low, the State has an obligation to provide 'timely, reasonable efforts . . . designed . . . to enable the safe return of the child to the family home.' " (omissions in original) (quoting AS 47.10.086(a))).

their children. Here, the evidence supports the superior court's findings that OCS offered Perry, Clarice, and the children a number of services designed to reunite them as a family, but Perry was ultimately unable or unwilling to significantly shift the beliefs that stood in the way of his effective parenting.

Clarice also makes a "reasonable efforts" argument on appeal, apparently contending that the superior court gave too little weight to several facts. She notes the superior court's stated "concern" with the lack of recent communication between the testifying OCS caseworker and the parents' therapists, though she does not cogently explain how this might have affected the court's reasonable efforts finding. The court acknowledged "that these efforts have not been perfect" but concluded that they were nonetheless "timely and reasonable, and really quite extensive as to both the parents and . . . the children." Given that we consider OCS's efforts "in their entirety,"[19] we are not persuaded that this lapse, which the court expressly took into account, undermines the reasonable efforts finding.

Clarice also points out that she and Perry were still attending family therapy when OCS filed its termination petition and that this move aggravated the parents' distrust, though again she does not explain how this undercuts the court's reasonable efforts finding. Reasonable efforts must be "made during a reasonable time period and [involve] time-limited services."[20] Efforts do not cease being reasonable because OCS determines that it is time to proceed to the next step in the process, especially in a case, like this one, in which OCS has had legal custody for seven years (Sierra) and three years (Zelda) and the children need permanency.

---

[19]     *Frank E.*, 77 P.3d at 720.

[20]     AS 47.10.990(29).

We conclude that the superior court's reasonable efforts finding is not erroneous.

## V. CONCLUSION

We AFFIRM the superior court's order terminating the parental rights of Clarice and Perry.