**VIVIAN P., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.**

No. S–10784.

Supreme Court of Alaska.

Oct. 16, 2003.

---

**34.** *See supra* note 23.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The superior court terminated Vivian P.'s parental rights. Vivian appeals the trial court's determination that Jason is a child in need of aid, that the Department of Health & Social Services, Division of Family & Youth Services (DFYS) made reasonable efforts to reunite the family, and that, in the alternative, DFYS was not required to make reasonable efforts because the child had been

subjected to mental and physical harm. Because the superior court did not err in terminating Vivian P.'s parental rights, we affirm its decision.

## II.  FACTS AND PROCEEDINGS

### A.  Factual History

Jason B. was born in December 1994 to Vivian P. and Jason B., Sr.[1] The couple had a previous child, Anne. Jason lived with his mother for about a year until she and Jason B., Sr. were both incarcerated in California. For the next four years, Jason lived with his paternal grandmother.

In 1999 Vivian was released on parole and regained custody of Jason. She married Mark P. and in 2000 moved the family to Kodiak, where she gave birth to another child.

Jason, who has attention deficit disorder and oppositional defiant disorder, began kindergarten at Main Elementary School in Kodiak. While Jason had some initial problems adjusting, he started to settle into a school routine. But on three separate occasions in a nine-month period from September 2000 to May 2001, Vivian withdrew Jason from school and voluntarily checked him into North Star Hospital in Anchorage for child psychiatric care.

After returning to school after his first hospital commitment, Jason's behavior regressed, and the school assigned a team of counselors and special educators to help him. Vivian claimed that Jason was having psychotic episodes, not eating, and repeatedly vomiting. Neither the school nor any hospital employees observed Jason exhibiting these problems.

After withdrawing Jason from school and checking him into the North Star Hospital a second time, Vivian told Dr. Lillibridge, a pediatric gastroenterologist, that Jason had lost twenty-five percent of his body weight and was having bouts of vomiting. Based on the mother's reports, Dr. Lillibridge decided to surgically place a feeding tube in Jason. Although Dr. Lillibridge instructed Vivian that the feeding tube was only to be used for home feedings, when Jason returned to school, Vivian showed off Jason's feeding tube to four school employees and told the school officials to use the feeding tube at school. During this meeting, Jason reportedly looked embarrassed and defeated, whereas Vivian reportedly seemed happy and excited. During Jason's third hospital stay, Dr. Lillibridge removed the feeding tube. Additionally, Jason reported numerous incidents of physical abuse at home, including being hit with a hanger and being forced to eat jalapeno peppers as punishment.

### B.  Procedural History

Due to Jason's repeated school absences, his reports of being abused, and the insertion of a feeding tube, the school filed a report of harm with DFYS. Subsequently, DFYS took emergency custody of Jason while he was at North Star Hospital for a third time. DFYS filed a petition asking for an adjudication that Jason was a child in need of aid. In August 2001 Superior Court Judge Donald D. Hopwood found Jason to be a child in need of aid, ruling that Vivian's conduct had inflicted serious physical and mental harm. Jason was placed in two successful foster homes, eventually being sent to his paternal grandmother who had raised him from the time of the mother's incarceration until her release.

DFYS filed a petition to terminate Vivian's parental rights in July 2002. After the adjudication that Jason was a child in need of aid, but before the termination hearing, Vivian returned to California without first saying goodbye to her son or informing DFYS of her plan to leave. Upon checking in with a parole officer in California, she was re-incarcerated for violating her parole, as she did not have the proper permission to travel back to California. Since being incarcerated, Vivian has not attempted to contact Jason through letters or phone calls.

The court held a termination hearing in August 2002 and terminated Vivian's parental rights, issuing written findings of fact and conclusions of law in support of that decision in November 2002. Vivian now appeals.

1.  Pseudonyms are used to protect the parties'  privacy.

## III. STANDARD OF REVIEW

We apply the "clearly erroneous" standard of review when analyzing a trial court's findings of fact regarding the termination of parental rights.[2] "Clear error arises only when our review of the entire record leaves us with a definite and firm conviction that the superior court has made a mistake."[3] "Whether the superior court's factual findings satisfy applicable child in need of aid statutes and rules is a question of law that we review de novo."[4]

## IV. DISCUSSION

In order to terminate a parent's rights and responsibilities in a child in need of aid (CINA) case, the state must show by clear and convincing evidence that:

(A) the child has been subjected to conduct or conditions described in AS 47.10.011; and

(B) the parent

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.[5]

Moreover, the state must prove by a preponderance of the evidence that DFYS has made reasonable efforts to reunite the family or that reasonable efforts were not necessary because a parent had "subjected the child to circumstances that pose a substantial risk to the child's health or safety; these circumstances include abandonment, sexual abuse, torture, chronic mental injury, or chronic physical harm."[6]

Vivian appeals the trial court's determination that Jason is a child in need of aid, that DFYS made reasonable efforts to reunite the family, and that, in the alternative, DFYS was not required to make reasonable efforts because Vivian subjected Jason to chronic mental injury and physical harm.

### A. Clear and Convincing Evidence Supports the Trial Court's Determination that Jason Is a Child In Need of Aid.

The trial court determined based on clear and convincing evidence that Jason was a child in need of aid. Laila Gonzales, Jason's second foster parent; Mary Gray, a DFYS social worker; and Dr. Welby Jensen, a psychiatrist in Kodiak, testified that Jason told them that he was hit with hangers and belts and that he was forced to eat jalapeno peppers as a form of punishment. Moreover, Ms. Gray, a sixteen-year employee of DFYS, testified that, in her expert opinion, Jason's reports of these incidents were consistent and not likely to be fabrications. Physical marks on Jason supported his claims. Dr. Daniel Mardones, a child and pre-teen psychiatrist at North Star Hospital in Anchorage, testified that Vivian probably suffered from Munchausen's Syndrome By Proxy, a mental health disease marked by a pattern of false reports that Jason showed signs of illness. Dr. Jensen stated that his observations of Vivian's and Jason's conduct were consistent with Dr. Mardones's diagnosis. Dr. Mardones also testified that Jason suffers from post-traumatic stress syndrome because of the alleged physical abuse and the feeding tube incident. No doctor disputed this testimony. Vivian's claims regarding Jason's psychotic behavior and eating problems were not verified by anyone, including her own witnesses, and were deemed by the superior court to be unreliable. On the contrary, many witnesses claimed that Jason was eating well and that his behavior had improved upon enrolling in school in Kodiak.

Joanna McFarlin, who works with students who have counseling issues at East and Main Elementary Schools in Kodiak; Jennifer Eubank, a special education teacher; and Patri-

2. *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002).

3. *Id.*

4. *Id.* at 1122–23.

5. AS 47.10.088.

6. AS 47.10.086(c)(1); AS 47.10.088(a)(2).

cia Gibbs, a school administrator and Jason's initial foster parent, testified that Vivian was callous toward Jason's feelings when she showed a room of four school officials Jason's feeding tube and insisted, despite the doctor's orders to the contrary, that the feeding tube be used at school. During this meeting, testimony indicated that Vivian seemed happy and excited with the feeding tube and Jason looked stunned and defeated. In particular, Ms. McFarlin testified:

> [Jason] ... walked in really like he was in pain and his lips were dry and kind of caked and [Vivian] looked—she smiled at all of us and she looked happy and she explained that—she had him sit down and she lifted up his shirt and she showed us that he had a feeding tube and she looked—I mean the only word that comes to my mind is gleeful and [Jason] looked like he was in pain and he looked embarrassed.

Lola Ann Lind, a case manager at Providence Kodiak Island Mental Health Center, testified that when she visited Vivian's home, Vivian seemed to show more affection for her cat than for Jason. Janet Brenteson, a DFYS social worker, also testified that Vivian seemed unattached to Jason, as Vivian did not react warmly when she saw Jason after he had been placed in a foster home.

In support of its ruling, the trial court found that Jason had suffered multiple incidents of being hit with hangers and belts, that Vivian force-fed him, and that he was forced by his stepfather to eat jalapeno peppers as a form of punishment. The court also found that Vivian likely suffers from Munchausen's Disorder by Proxy. According to the trial court, Vivian, as a result of this disorder, manufactured claims that Jason was suffering psychotic episodes, encountering serious bouts of vomiting, and losing up to twenty-five percent of his body weight. The court noted that no other person who observed Jason on a regular basis agreed with Vivian's assessment of Jason's lack of well-being. According to the superior court, a pediatrician, relying on Vivian's reports and assessment, inserted a feeding tube into Jason, which was later removed because it

was deemed unnecessary. The superior court held that as a result of the physical abuse and the insertion of the feeding tube, Jason suffered from post-traumatic stress syndrome.

Moreover, the court found that Vivian withdrew Jason from school and checked him into a children's psychiatric hospital three times during a nine-month period. It also found that Vivian exhibited little attachment to Jason, seemed more interested in her cat, and seemed oblivious or indifferent to her son's feelings when she spoke to others about him in his presence and callously showed off his feeding tube. Vivian, the court found, left Alaska without saying goodbye to Jason when he was in foster care. The record supports the trial court's factual determinations.

The trial court concluded that Jason was a child in need of aid because of Vivian's incarceration, her failure to obtain necessary treatment for Jason, physical harm and threat of continued physical harm caused to Jason by Vivian, mental injury and the threat of continued mental injury caused to Jason by Vivian, and the risk that Jason would be harmed or injured due to Vivian's mental illness.[7] The trial court found the evidence to be so overwhelming that it determined beyond a reasonable doubt that Jason was a child in need of aid. We agree that these factual findings satisfied the CINA statutes.

**B. DFYS Did Not Make Reasonable Efforts To Reunite Vivian and Jason.**

■ Vivian argues that the court erred in determining that DFYS made reasonable efforts to reunite Vivian and Jason. The superior court found that the state had engaged in reasonable efforts to assist Vivian in being reunited with her child because before DFYS removed Jason from Vivian's home, "service providers normally involved by DFYS attempted to correct the situation and provide assistance" and Vivian "did not avail herself of those services." The superior court also found that "efforts to assist [Vivian] continued after DFYS became involved, and [Vivi-

7. AS 47.10.011(2), (4), (6), (8), (11).

an] still did not utilize the offered services or change her behavior."

In making this finding, the superior court implied that DFYS did not have to make reunification efforts because services were provided by school personnel before commencement of the CINA proceeding:

> Before the DFYS folks became involved directly in this, there were huge efforts made by many other service providers, the same ones that the department would refer people to and utilize and in fact did after they became involved to correct the situation.... I can't require the department to simply cover the same ground that was done before and did not succeed although services were offered.

But under AS 47.10.086(a), DFYS must make reasonable efforts to reunite the family. Furthermore, in *A.M. v. State*, we noted that "[w]e have never suggested that the scope of the State's duty to make active remedial efforts should be affected by a parent's motivation or prognosis *before remedial efforts have commenced.*"[8] And there is good reason to require that reasonable efforts be made after DFYS's intervention. Prior to DFYS's intervention, a parent is unaware that failure to take advantage of services provided could lead to the loss of parental rights. After DFYS intervention, that parent is aware of the consequences of non-compliance and may have more incentive to take advantage of services offered to improve the home.

Consequently, to the extent that it relied on services offered and refused prior to DFYS's involvement with the parent to reach its conclusion that reasonable efforts had been made, the trial court erred.[9]

**C. While DFYS Needed the Court's Approval Before Ceasing Reasonable Efforts, the Court Did Not Err in Determining Reasonable Efforts To Be Unnecessary.**

In the alternative, the superior court ruled that DFYS was excused from the requirement to make reasonable efforts. Alaska Statute 47.10.086(c)(1) provides that "reasonable efforts ... are not required if the court has found by a preponderance of the evidence that the parent ... has subjected the child to circumstances that pose a substantial risk to the child's health or safety." According to the statute, "these circumstances include abandonment, sexual abuse, torture, chronic mental injury, or chronic physical harm." Alaska Statute 47.10.086(c)(1) incorporates into Alaska law the federal Adoption and Safe Families Act of 1997 (ASFA), which is designed to eliminate remedial requirements in extreme circumstances.[10] At the termination hearing, Judge Hopwood determined that Vivian and Mark P. "continuously physically and mentally abused [Jason] during their nine months together in Kodiak." The superior court, therefore, concluded that "[Vivian] subjected [Jason] to ... chronic mental injury or chronic physical harm," making reasonable efforts unnecessary.

■ Vivian argues that the court's determination at the termination hearing that reasonable efforts were unnecessary was erroneous because AS 47.10.086 anticipates a hearing at which the court decides whether reasonable efforts are required. "The plain language of the statute requires notice and an opportunity to be heard before the state can stop making reasonable efforts." But Vivian never raised this objection at trial. At the beginning of the termination trial, the state argued that the "reasonable efforts re-

---

**8.** 891 P.2d 815, 827 (Alaska 1995), *overruled on other grounds by In re S.A.,* 912 P.2d 1235, 1239 (Alaska 1996) (emphasis added).

**9.** The only evidence which suggests that DFYS made reasonable efforts after its intervention comes from Mary Gray, a DFYS social worker, who testified that "prior to DFYS intervention those services were—were being made available and they were not taken advantage of at that time either. And certainly for the last 15 months they have been in a formal way [provided] by DFYS administratively as well as through the

court." However, the trial court apparently did not rely on her testimony when making its findings of reasonable efforts, instead erroneously taking into account "all of the efforts that were done even before the state became involved." A preponderance of the evidence does not show that DFYS made reasonable efforts to reunite the family.

**10.** *J.S. v. State,* 50 P.3d 388, 392 & n. 13 (Alaska 2002).

quirement ... can be dispensed with if we simply show that the parent has subjected the child to circumstances ... [that] include chronic mental injury or chronic physical harm," and "the court can see ... this requirement by reading 47.10.086(c)(1) and (c)(7)." Vivian's attorney did not object to this argument, instead responding, "I don't dispute the statutory outline that the state ... [has] made today." Vivian's attorney acknowledged that "[t]he court did make findings last year that physical harm had in fact occurred at the hands of [Vivian]" and conceded that the court "may determine that reasonable efforts are not required but it also may determine that reasonable efforts were required." Despite conceding that the court could find reasonable efforts to be unnecessary, Vivian asked the court "to find that reasonable efforts were necessary and that they were not made." To which the court responded: "How would I do that if from the August 2001 findings and conclusions there's already been a determination that [Jason] suffered substantial physical harm as a result of abusive and neglectful conduct by the mother?" By conceding that the court could find reasonable efforts to be unnecessary, Vivian failed to preserve this issue for appeal. We will not address an issue on appeal that was not raised at trial.[11]

■ But we agree with Vivian's observation that the statutory framework prevents DFYS from deciding on its own, prior to a hearing or order by the court, that reasonable efforts are unnecessary and can be dispensed with pursuant to AS 47.10.086(c)(1). The statutory language instructs the court, and not DFYS, to make the determination regarding the need for reasonable efforts: "The court may determine that reasonable efforts ... are not required...."[12] The statute further requires a court to hold a perma-

nency hearing thirty days after determining that reasonable efforts are not necessary: "If the court determines ... that reasonable efforts under (a) of this section are not required to be provided, the court shall hold a permanency hearing for the child within 30 days after the determination."[13] The cessation of reasonable efforts should only occur when a court determines those efforts to be unnecessary. Consequently, DFYS can not unilaterally determine that reasonable efforts are unnecessary, waiting until the termination proceedings to argue that they are excused.[14]

But the fact that DFYS is precluded from determining on its own that reasonable efforts are unnecessary under AS 47.10.086(c)(1) does not preclude the court from determining after commencement of a termination trial that the reasonable efforts requirement is excused. Indeed, we decided on appeal in *J.S. v. State* that unification efforts were excused. In that case, a sexually abusive father appealed the termination of his parental rights, claiming that the state did not meet the Indian Child Welfare Act's requirement for active remedial efforts.[15] The superior court had "found that it was uncontroverted that the state failed to offer any type of active remedial or rehabilitative services to Jack."[16] Consequently, "[t]he superior court held the record open for sixty days in order to allow the state to develop and offer a treatment plan to Jack."[17] In reviewing the superior court's ruling on remedial efforts, we concluded that remedial efforts were unnecessary because ASFA excused them due to sexual assault.[18] We reasoned that "the enactment of [ASFA] convinces us that it is the policy of Congress to not require remedial measures in situations where a court has determined that a parent

11. *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001).

12. AS 47.10.086(c).

13. AS 47.10.086(d)(1).

14. As a matter of policy, requiring DFYS to seek from the court a determination that reasonable efforts are excused will help to prevent post-hoc justifications for failing to provide reasonable

efforts. DFYS must first ask a superior court for a reasonable efforts hearing before ceasing to make such efforts.

15. 50 P.3d 388, 389, 391 (Alaska 2002).

16. *Id.* at 390.

17. *Id.*

18. *Id.* at 391–92.

has subjected his or her child to sexual abuse." [19] We further explained that "[t]his provision of the federal act has been adopted in Alaska as AS 47.10.086(c)(1)," which eliminates the remedial requirements in cases involving chronic physical and mental abuse in addition to sexual abuse.[20] Thus, we concluded that the superior court did not err in terminating the father's parental rights because rehabilitative efforts are not necessary in AS 47.10.086(c)(1) cases.

At the adjudication hearing in this case, the superior court found beyond a reasonable doubt that Jason was a child in need of aid because, in part, the physical harm he suffered "is substantial and likely would continue to be substantial ... [and][t]he mental injury exists now, and he remains at an extraordinary risk of continuing mental injury." Had DFYS asked the superior court at the adjudication hearing to determine that reasonable efforts were not necessary because Jason had been subjected to chronic mental injury or physical harm, the court could have found reasonable efforts to be unnecessary. The evidence in the record supports the superior court's alternative conclusion at the termination hearing that reasonable efforts were unnecessary, and we affirm its decision.

## V.  CONCLUSION

Because the trial court did not err in finding Jason to be a child in need of aid, and because the trial court did not err in finding reasonable efforts to be unnecessary, we AFFIRM the decision to terminate Vivian P.'s parental rights.

---

**19.**  *Id.* at 392.

**20.**  *Id.* at 392 n. 13;  AS 47.10.086(c)(1).