*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KYLIE L., | ) | |
| | ) | Supreme Court No. S-16520 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-13-00120 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | No. 7205 – October 13, 2017 |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Megyn Greider, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating]

WINFREE, Justice.

## I. INTRODUCTION

After the trial court found that the Office of Children's Services (OCS) failed to demonstrate it had made reasonable efforts to reunify a family, the court nonetheless terminated the mother's parental rights to her daughter, finding that OCS's

failure was "excused." The mother appealed; we earlier issued an order reversing the court's "excused" determination and vacating the trial court's termination order, indicating we would fully discuss our reasoning in a later opinion. We do so now.

## II. FACTS AND PROCEEDINGS

Kylie L. and Kurt B. began a relationship in 2003 and had a daughter, Belinda B., in 2010.[1] Kurt was often abusive toward Kylie, who remained in the relationship partly because Kurt threatened that if she left him he would kill her and Belinda.

OCS became involved with the family in May 2013 when Kurt injured Belinda. In the midst of an alcohol-fueled argument Kurt threw a glass beer bottle at Kylie; he instead hit Belinda in the back of the head, knocking her off the table on which she was seated. Kylie escaped to the bedroom with Belinda, but Kurt followed them, punching Kylie in the head and jumping on her as she attempted to protect Belinda with her body. Despite a "baseball sized lump" on Belinda's head, Kurt refused to let Kylie secure medical care, hiding Kylie's phone and car keys to prevent her taking Belinda to a doctor.

The next morning Kurt returned Kylie's phone and keys so she could go to work. When Kylie arrived at work she called the police, reported the abuse to a child advocacy center, and brought Belinda to a hospital for medical attention. Kurt was arrested and OCS opened an investigation. Belinda received a forensic evaluation and follow-up care. In June Kylie obtained a domestic violence protective order to keep Kurt away from her and Belinda.

Kylie soon entered into a relationship with Lou C. Lou was not a safe companion; he used methamphetamine and "had a lot of involvement with the law." Yet

---

[1] Pseudonyms are used to protect the parties' privacy.

Kylie had difficulty accepting that Lou was dangerous because he "didn't physically harm her like her past partners had."

OCS closed its investigation in August, substantiating findings that Kurt had harmed Belinda. Only a week after closing its first investigation, OCS received another report of harm to Belinda. Kylie, Belinda, Lou, and Lou's son had gone on a road trip. Kylie explained that during this trip she noticed Belinda was not placing weight on one of her legs. The day after they returned from the trip, Kylie took Belinda to the hospital; Kylie and Lou told the hospital staff they did not know how Belinda had been injured but thought perhaps Lou had reclined his car seat onto the girl's ankle. They told the doctor that Belinda had not cried out when they thought the injury might have occurred, nor had she cried during the trip. The doctor believed the injury — two broken bones in Belinda's leg — was not consistent with Kylie's explanation and reported to OCS his suspicions of non-accidental trauma.

OCS initiated an investigation and implemented a protective action plan under which Belinda stayed with a family friend. OCS requested that Kylie and Lou submit to urinalysis (UA) testing, but neither showed up. The OCS caseworker referred Kylie and Belinda to a family preservation program. The caseworker, who had received reports that Lou was involved in drug trafficking, discussed with Kylie that Lou was an unsafe person, emphasizing the danger of exposing children to methamphetamine. By September Kylie had begun to express that she understood the danger Lou posed and had told OCS the relationship was over. The OCS worker felt Kylie "had begun to demonstrate protective capacities" and moved Belinda from an out-of-home safety plan to an in-home safety plan, requiring supervision by Kylie's mother.

Problems with the in-home safety plan quickly developed; Kylie's mother was leaving Belinda alone with Kylie and failing to report to OCS as required. In October Kylie moved to modify the protective order against Kurt, telling the court she

wanted "[t]o re-establish [the] relationship between [Kurt] and his daughter." During this period the case was transferred to an OCS family services worker who spoke with Kylie about how her pattern of engaging with dangerous men posed a threat to Belinda. The OCS worker believed Kylie was not internalizing these messages: because Lou did not physically abuse Kylie, she continued to have trouble accepting that he was unsafe, and she was planning to visit an old friend who recently had been released after serving time in prison for a manslaughter conviction resulting from a road rage incident.

In November, after Belinda had been returned to Kylie's care under the in-home safety plan, OCS received a third report of harm, this time concerning a cigarette burn on Belinda's lower back. Kylie told Belinda's daycare workers that she had been holding a cigarette while removing her daughter from a car seat and that the "cherry" fell into Belinda's diaper and burned the girl. OCS took emergency custody of Belinda the day after receiving the report; OCS filed an adjudication and temporary custody petition the following day asserting that Kylie had minimized the incident.

After assuming custody and placing Belinda in foster care, OCS continued providing services to Kylie and Belinda. OCS arranged visitation between the two and made service referrals for relationship classes, a parental risk assessment, a substance abuse assessment, and dyadic therapy, which focuses on the parent-child relationship with the goal of healing the child's trauma within the context of an attachment relationship. OCS also assisted Kylie in meeting basic needs by obtaining food boxes and assisting her efforts to secure housing and heating fuel.

By all reports the dyadic therapy began very well. At some point Kylie revealed to her therapist that she was still in a relationship with Lou and that he was living in her home. But when the therapist attended a February 2014 OCS meeting addressing the possibility of a trial home visit, she did not pass on to OCS information about Lou's continued presence in the home.

OCS learned that Kylie was pregnant with Lou's child the following month. Because Kylie had previously revealed the pregnancy and continuing relationship to her therapist, OCS was concerned that Kylie was triangulating providers — "telling one professional one thing, another professional something else" — making it difficult to work as a team. The therapy center did not agree with that assessment.

Kylie contended that her relationship with her daughter began to deteriorate in March, when Belinda was transferred to new foster parents who had little experience. Belinda began telling her new foster parents that her mother and father had hurt her; this led to another forensic interview, but no abuse was substantiated. OCS also moved visits from an off-site center to its own facilities. Belinda soon began exhibiting troubling behaviors and resisting visitation.

In April OCS referred Belinda to individual therapy. This decision was made in part by an OCS supervisor who was herself receiving therapy from the same therapist and who was going through a contentious divorce involving significant domestic violence allegations. The original dyadic therapist tried unsuccessfully to coordinate efforts with this new therapist and address issues that might arise if Belinda were to continue seeing them both.

In May OCS abruptly ended Kylie and Belinda's dyadic therapy sessions. Also in May Lou was arrested on suspicion of involvement in a child's death; another woman he was seeing apparently killed her son and Lou was later convicted of failing to report the crime. Lou's arrest effectively terminated his relationship with Kylie.

In July OCS cancelled visitation between Kylie and Belinda. OCS made the decision to cancel visitation based on the advice of Belinda's new therapist, although that therapist had never met Kylie.

Kylie began receiving individual therapy in August. In September OCS filed a petition for the termination of Kylie's and Kurt's parental rights. This situation

generally continued — no dyadic therapy or visitation between Kylie and Belinda, each of them receiving individual therapy — until December, when Kylie engaged Dr. Marti Cranor, a licensed psychologist, to review the OCS file and give an opinion on OCS's decision-making in the case. Dr. Cranor was critical of OCS's efforts; she did not believe Belinda's individual therapy was appropriate, she believed dyadic therapy should not have been terminated, and she believed OCS had displayed a pattern of misrepresentation and exaggeration.

In January 2015 an OCS staff manager reviewed the case and found it was not being handled appropriately. She believed OCS was not being very helpful and that providers were working at odds and not communicating. She directed visitation to resume, which it did in late January after almost seven months without any contact between Kylie and Belinda.

The OCS staff manager also replaced Belinda's individual therapist. The new therapist restarted dyadic therapy and diagnosed Belinda with post-traumatic stress disorder, observing a wide range of associated symptoms. The therapist noted that although Belinda and Kylie appeared to be making progress, things soon deteriorated again. She believed contact with Kylie was triggering Belinda's traumatic symptoms and that as a consequence their bond was weakening.

In July Kylie made what she later acknowledged was a poor choice; she emailed Kurt after he was released from jail and arranged to meet with him in a public parking lot so she could update him on Belinda. Kylie told the new therapist about the incident but then denied the contact when an OCS caseworker questioned her about it, maintaining her denial until the caseworker confronted her with a copy of the email she had sent Kurt.

In September OCS issued a Quality Assurance Report — an internal review of its management of the case. The review documented a number of significant

concerns, including that: services "have not been well organized and have not served to facilitate reunification"; OCS was not providing a warm environment for visitation; and documentation of visits was "overly negative," contributing to an unwarranted negative "narrative or belief system" about Kylie.

Belinda's behavior surrounding visitation continued to regress; by October OCS workers and her foster parents had to physically force her to attend. Her therapist was concerned that visitation had become re-traumatizing for Belinda and that forcing her to attend threatened her ability to maintain safe relationships. Based on these concerns OCS made visitation voluntary, giving Belinda the option of attending visitation every week; Belinda consistently declined, effectively terminating visitation.

In November Kylie obtained a neuropsychological assessment at OCS's request. The assessment was generally quite positive, concluding that Kylie understood the impact on her daughter of past trauma and that Kylie could safely care for her daughter as long as she avoided abusive relationships.

Although visitation had been effectively suspended, dyadic therapy continued. But by early 2016 the therapist, who had grown increasingly concerned about the risk continued joint therapy sessions posed to Belinda's mental health, discontinued dyadic therapy and limited Belinda to individual therapy instead.

Meanwhile, Kylie secured a full-time job with the local school district, obtained affordable permanent housing, and completed a number of relevant training courses on her own initiative. Kylie had not been in a relationship since Lou's arrest in May 2014.

A termination trial was held in June 2016. The trial court issued its decision on record in October. The court found that OCS met its burden of proof on all

issues except for the requirement that it make reasonable efforts to reunify the family.[2] Despite OCS's failure to demonstrate that it had made reasonable efforts, the court nonetheless terminated Kylie's parental rights, holding that the reasonable efforts requirement was "excused" because remedying the deficiency by providing OCS more time would be pointless and harmful to Belinda due to the ruptured mother-child bond.

---

[2]   Under relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights may be terminated at trial only if OCS shows:

> (1) by clear and convincing evidence that
>
> > (A) the child has been subjected to conduct or conditions described in AS 47.10.011 and
> >
> > > (i) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
> > >
> > > (ii) the parent has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; [and]
> >
> > . . . .
>
> (2) by clear and convincing evidence that
>
> > (A) the Department has complied with the provisions of AS 47.10.086 concerning reasonable efforts; [and]
> >
> > . . . .
>
> (3) by a preponderance of the evidence that termination of parental rights is in the best interests of the child.

CINA Rule 18(c); *see also* AS 47.10.088 (establishing requirements for termination).

Kylie appealed, and we earlier issued an order vacating the termination of her parental rights. This opinion explains the basis for that order.

## III. STANDARD OF REVIEW

" 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.' For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[3]

"Whether the superior court's factual findings satisfy the CINA statutes is a question of law that we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[4]

## IV. DISCUSSION

Kylie challenges the trial court's finding that she failed to remedy the conduct or conditions that put Belinda at risk of harm and its holding that OCS was excused from making reasonable efforts to reunify her family. Because we conclude the trial court improperly excused OCS's failure to demonstrate reasonable efforts were made, we do not reach the question of failure to remedy.

### A. Reasonable Efforts Play An Important Role In Every CINA Case.

We have stated in the Indian Child Welfare Act (ICWA)[5] context that the "scope of the State's . . . dut[ies]" may not be varied "based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis" because to do

---

[3] *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014)).

[4] *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013) (citing *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002)).

[5] 25 U.S.C. §§ 1901-1963 (2012).

so "might defeat the purpose of the active remedial effort requirement."[6] This uncompromising standard holds true in every CINA case: even if the outlook is bleak and the likelihood of success is low, the State has an obligation to provide "timely, reasonable efforts . . . designed . . . to enable the safe return of the child to the family home";[7] this obligation persists because "terminating parental rights is a drastic measure," as we must always bear in mind.[8] OCS's remedial efforts are a "critical component" of state intervention in the family; they serve to avoid the drastic measure of termination whenever feasible, and procedurally they form a "necessary bridge between a need of aid finding and a failure to remedy finding."[9] Before terminating

[6]    *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996). Although ICWA's " 'active efforts' requirement . . . is more demanding than the 'reasonable efforts' requirement of AS 47.10.086," *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006), and imposes a "higher burden" on OCS, *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 646-47 (Alaska 2013), the requirements serve the same function of attempting to facilitate the child's safe return to the parent, *see* CINA Rule 18(c)(2)(A)-(B); AS 47.10.086(a), and the reasoning from ICWA cases on OCS's active efforts obligations in varying circumstances is generally applicable in non-ICWA cases as well, *Winston J.*, 134 P.3d at 347 & n.18; *cf. Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 n.31 (Alaska 2009) ("Our conclusion that the superior court did not err in holding that the state met its active efforts requirement also disposes of [appellant's] argument that the state failed to meet the lower 'reasonable efforts' requirement in AS 47.10.086." (citing *Winston J.*, 134 P.3d at 347 n.18)).

[7]    AS 47.10.086(a).

[8]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

[9]    *Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 468 (Alaska 2012) (Winfree, J., dissenting) (2-2 decision) (citing (continued...)

parental rights, courts must "identify the problem that caused the [child] to be in need of aid"[10] and then evaluate whether OCS made remedial "efforts to assist the parent in remedying the conditions that led to finding the child in need of aid" and ensure those efforts were "specifically designed to prevent the breakup of the . . . family."[11] To provide anything less — although necessary and permissible in some circumstances[12] — risks infringing the "right to the care and custody of one's own child . . . recognized by both the federal and state constitutions."[13]

B. It Was Error To Excuse Reasonable Efforts In This Case.

Alaska Statutes 47.10.086(a) and 47.10.088(a) "require a finding, by clear and convincing evidence, that OCS has made 'timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family

---

[9] (...continued)
*Christina J.*, 254 P.3d at 1104); *see* AS 47.10.086(a)(1) (requiring reasonable efforts to include "family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child in need of aid").

[10] *Josh L.*, 276 P.3d at 468 (Winfree, J. dissenting) (2-2 decision) (alteration in original) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010)).

[11] *Id.* (citing CINA Rule 18(c)(2)(B); *Jon S.*, 212 P.3d at 763).

[12] *See* AS 47.10.086(a) ("Except as provided in (b), (c), and (g) of this section, the department shall make timely, reasonable efforts . . . .").

[13] *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) (quoting *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001)).

home.' "[14] "In the alternative," the trial court can find that OCS "was excused from the requirement to make reasonable efforts"[15] if it finds by clear and convincing evidence that one of the bases listed in AS 47.10.086(c) applies.[16] Two subsections arguably are relevant here. Reasonable efforts may be excused under subsection (c)(1) if "the parent . . . has subjected the child to circumstances that pose a substantial risk to the child's health or safety," including "abandonment, sexual abuse, torture, chronic mental injury, or chronic physical harm." They also may be excused under subsection (c)(7) if the "child has suffered substantial physical harm as the result of abusive or neglectful conduct by the parent . . . or by a person known by the parent . . . and the parent . . . knew or reasonably should have known that the person was abusing the child."[17]

Alaska Statute 47.10.086(c)(1) was "designed to eliminate remedial requirements in extreme circumstances."[18] "[T]he statutory framework prevents [OCS] from deciding on its own, prior to a hearing or order by the court, that reasonable efforts

---

[14] *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1164 (Alaska 2016) (alteration in original) (quoting AS 47.10.086(a)) (citing CINA Rule 18(c)(2)).

[15] *Vivian P. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 78 P.3d 703, 708 (Alaska 2003).

[16] AS 47.10.086(c) lists these bases in 11 subsections. Qualifying reasons for excusing reasonable efforts under these subsections range from extreme criminal behavior — e.g., sexual abuse, torture of the child, or homicide of the other parent — to the objectively demonstrated futility of further efforts — e.g., a parent's incarceration or failure to comply with court orders, OCS's inability to identify or locate a parent after diligent search, or a recurring pattern of removal from the home.

[17] AS 47.10.086(c).

[18] *Vivian P.*, 78 P.3d at 708 (citing *J.S. v. State*, 50 P.3d 388, 392 & n.13 (Alaska 2002)).

are unnecessary . . . . The statutory language instructs the court, and not [OCS], to make the determination regarding the need for reasonable efforts . . . ."[19] "But the fact that [OCS] is precluded from determining on its own that reasonable efforts are unnecessary . . . does not preclude the court from determining after commencement of a termination trial that the reasonable efforts requirement is excused."[20]

Here the trial court found "OCS did not meet its burden of proof on the issue of providing reasonable efforts to reunify this family." But the court later continued: "That is not the end of the question though. . . . [O]nce I find that [OCS] has not met its reasonable efforts requirements, then the issue is what does the court do with that." The court felt that doing what "traditionally . . . happens" and setting the case out for 6 to 12 months to permit continued efforts was "a non-starter." The court instead chose to excuse the reasonable efforts requirement, stating that its decision was based on its understanding of testimony by Kylie's expert witness, Dr. Cranor, that the "parent-child bond has been irrevocably breached" so that it would be "harmful to [Belinda]" and pointless to continue attempting to reunify the family.

Kylie argues the trial court erred by excusing the reasonable efforts requirement. OCS argues that we can affirm: first, on the alternative ground that OCS made reasonable efforts, notwithstanding the trial court's finding to the contrary; second, on the basis that the decision to excuse reasonable efforts was valid under AS 47.10.086(c)(1) or (c)(7), even if the trial court did not expressly rely on either.

---

[19]    *Id.* at 709 (citing AS 47.10.086(c)).

[20]    *Id.*

**1. The trial court did not clearly err in finding OCS failed to demonstrate it had made reasonable efforts.**

OCS first argues that we should "affirm the superior court's decision on the alternative ground[] that OCS's efforts, viewed in totality, were reasonable," in effect asking us to rule that the trial court clearly erred in finding OCS failed to demonstrate it had made reasonable efforts. But the trial court's determination was supported by evidence in the record. The court noted that OCS's own internal review found the department had unreasonably stopped visitation and made poor decisions, and that those bad decisions had "really influenced the outcome of the case thereafter." OCS's internal review also found that: services "ha[d] not been well organized and ha[d] not served to facilitate reunification"; case managers had changed providers "because [they did] not like [the initial providers'] findings"; Kylie "appeared to be spot lighted [sic] in the visits" and the supervising OCS worker excessively regulated her interactions with Belinda; the OCS worker refused to refer to Kylie as "mom" during visits and did not provide a "warm environment"; Kylie "appear[ed] to be a lonely figure, not receiving much support"; "documentation of the visits [wa]s overly negative, appearing to inflate incidents"; and that this negative documentation "appear[ed] to migrate to other parts of the case record, contributing to a 'narrative or belief system' about the mother which may not [have been] based in fact."

The trial court found the internal review's conclusions were buttressed by Dr. Cranor's testimony, which the court gave "value and weight." Dr. Cranor testifed that: stopping visitation and changing therapy had been unwarranted; the decision to do so was based on "inaccurate or misleading information that had . . . been perpetuated in the file"; OCS had "tried to justify [the decision] after the fact by saying . . . the therapist told [them] to do" so when that was not the case; and OCS minimized positive information about Kylie while exaggerating harm to Belinda.

OCS points to extensive other services it provided to the family, including visitation during other periods, regular therapy for both mother and daughter, efforts to remedy the problems identified in the internal review, various action and safety plans, referrals for UAs and a substance abuse assessment, and assistance with stress management and housing. It argues that "the court's decision to narrowly focus on the months in which there was no visitation fails to appreciate or acknowledge" those "broader services" and notes that we have frequently held reasonable efforts determinations must be made by looking at OCS's efforts in their entirety and not at a particular segment in time.[21]

These are valid arguments. But "we will not reweigh evidence when the record provides clear support for a trial court's ruling" and "[c]onflicting evidence is generally not sufficient to overturn a trial court's factual findings."[22] The trial court had clear support — from OCS's own witnesses and internal review, as well as credible expert testimony — for its finding that OCS failed to carry its burden of demonstrating it had provided reasonable efforts. That finding was not clearly erroneous.

### 2. Excusing reasonable efforts on the grounds provided was error.

Alaska Statute 47.10.086 permits a trial court to excuse reasonable efforts when it finds by clear and convincing evidence that one of the bases enumerated in AS 47.10.086(c) applies. But Kylie correctly argues that AS 47.10.086(c) "clearly [wa]s not [the] reason for the court's ruling." At the trial's conclusion the court noted its view

---

[21] *See Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003) ("[W]e examine whether the state's reunification efforts, when looked at in their entirety, satisfy the requirements of AS 47.10.086(a).").

[22] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013)).

of Dr. Cranor's testimony that the mother-daughter bond had been "irrevocably damaged" and asked for closing briefing on what to do with that information if it concluded sufficient services had not been offered by OCS. It acknowledged that "[s]ometimes judges will see cases" without sufficient services and will order additional time for further efforts, but stated "this case doesn't resonate with me as something that if [there were not sufficient services]" more time would be an appropriate remedy. In its decision on record the court repeatedly pointed to its view of Dr. Cranor's testimony that the parent-child bond had been damaged or destroyed; the court based its decision to excuse the failure in services on its finding that the bond was destroyed and that further efforts would be harmful and pointless.[23] The court relied exclusively on its

---

[23]     We note our concern that Dr. Cranor's testimony was too conditional and ambiguous to stand as the primary support for the trial court's determination. There were two relevant exchanges at trial. On direct examination by Kylie's attorney, Dr. Cranor testified:

> Q:     Based on your two reports and what you viewed of the file through March of 2016, did you come to any conclusions as to whether OCS has acted fairly with [Kylie]?
>
> A:     In my opinion, I do not believe she was given a fair opportunity to demonstrate that she was able to safely parent her child and, . . . I believe that she was deprived visitation for questionable reasons and that, as a result of that, more than likely . . . her relationship with her daughter has been irrevocably altered, if not destroyed.

On cross-examination by OCS shortly after this, Dr. Cranor testified:

> Q:     So based on your experience and the information you reviewed, what services should be and are available in Fairbanks, and how long — well, what services would be available if the dyadic therapy isn't working to repair what

(continued...)

-16-                                                               7205

(...continued)

you perceive to be an irreparable rift in the parent-child bond?

A:     Well, I think you just answered the question there. If it's irreparable, I don't think there are services that can repair it.

Q:     So at this point, your testimony would be that perhaps no length of time of further waiting is going to fix our current situation?

A:     That's correct.

The trial court interpreted this testimony as conclusive evidence that the parent-child bond had been ruptured beyond repair.

Kylie challenges the court's interpretation of Dr. Cranor's testimony with justification. Kylie is correct that Dr. Cranor on direct examination did not take as strong a stand as the court later credited. Dr. Cranor testified that the relationship had "more than likely" been "irrevocably altered, if not destroyed." If the relationship had merely been altered, then that would undermine the reasoning behind the trial court's decision to terminate parental rights. And if the damage were not "irrevocabl[e]" — a possibility Dr. Cranor's testimony allowed for, although she believed it more likely that the damage was permanent — that would also undermine the basis for the decision. It also is noteworthy that in this first exchange, Dr. Cranor was responding to a question not about the extent or manner of the damage to the mother-child relationship but about OCS's failings in the case; she referenced the damage only in passing to illustrate the problems caused by what she considered OCS's unfair treatment of Kylie.

Kylie's challenge to the trial court's interpretation of Dr. Cranor's testimony on cross-examination likewise has merit. As Kylie notes, "Dr. Cranor answered a conditional and tautological question with a conditionally affirmative answer." This is an accurate characterization. The question was conditional: "[W]hat services *would be* available *if* the dyadic therapy isn't working . . . ?" The question was tautological: What could be done to "repair . . . an irreparable rift . . . ?" And the answer was only conditionally affirmative: "*If* it's irreparable, I don't think there are services that can repair it."

(continued...)

conviction that further efforts would be pointless, and it did not find by clear and convincing evidence that an AS 47.10.086(c) basis applied.[24]

That decision was legal error. Alaska Statute 47.10.088(a)(3) requires the trial court to determine by clear and convincing evidence that OCS has complied with AS 47.10.086's provisions; AS 47.10.086(a) provides that OCS "*shall* make timely, reasonable efforts" except, in relevant part, as provided in subsection (c).[25] If the trial court does not find by clear and convincing evidence that one of those enumerated bases applies, there is no room in the statutory framework to excuse reasonable efforts on

---

[23] (...continued)
OCS responds with two arguments. It first notes that Dr. Cranor was asked what could be done to repair "*what you perceive to be* an irreparable rift," and that rather than denying she viewed the rift as irreparable or otherwise equivocating about the question's assumptions, she simply stated that in such a situation nothing could be done. OCS then points to the exchange's conclusion as confirmation that the doctor did not question the premise of an irreparable rift that further efforts could not repair. In that exchange Dr. Cranor answered affirmatively when asked whether "your testimony would be that perhaps no length of time of further waiting is going to fix our current situation." That is questionable: "perhaps" means just that — perhaps.

[24] The court made a passing reference to AS 47.10.086(c)(7) in its decision on record when acknowledging OCS's argument — made for the first time in its closing brief after trial had concluded — that the subsection should apply, remarking that it "[did]n't disagree with that." Briefly acknowledging OCS's closing argument does not constitute a finding by clear and convincing evidence that the subsection applies under the facts of this case.

The only other legal authority the trial court provided for excusing reasonable efforts was our decision in *Vivian P. v. State, Department of Health & Social Services, Division of Family & Youth Services*, 78 P.3d 703 (Alaska 2003). But in that case the trial court found OCS was excused from the reasonable efforts requirement on the basis of AS 47.10.086(c)(1) because the parent had subjected the child to "chronic mental injury or chronic physical harm." *Id.* at 708.

[25] AS 47.10.086(a) (emphasis added).

alternative bases. Nor would a decision to forego required reasonable efforts in expectation of their futility comport with our parallel ICWA holdings; in that context we have stated that courts may not "vary the scope of the State's ICWA duty based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis" because doing so "might defeat the purpose of the active remedial effort requirement, for it would enable the State to argue, in all doubtful and difficult cases, that it had no duty to make active remedial efforts."[26]

### 3. We decline to affirm on the basis of AS 47.10.086(c)(1) or (c)(7).

Citing *Torrey v. Hamilton*,[27] OCS next argues that we "may affirm the superior court's decision on any appropriate ground, even if it is a ground that was rejected by the trial court," and that AS 47.10.086(c)(1) and (c)(7) both provide bases to do so. OCS contends that subsection (c)(7) should apply because the trial court "found Kylie subjected Belinda to circumstances that posed a substantial risk to her health or safety," noting she had "endured three physical injuries while in Kylie's care." OCS argues that although "the court's finding did not rest" on subsection (c)(7), its passing remark in its decision on record — the court stated it "[did]n't disagree" that subsection (c)(7) should apply —  shows the court "clearly understood that it could have." OCS concludes that "given the breadth of evidence supporting the court's substantial physical harm finding — and Kylie's acknowledgement [sic] that the provision has 'some relation to this case,' " we "should affirm the court's finding that

---

[26] *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996).

[27] 872 P.2d 186, 188 (Alaska 1994) ("Although the trial judge explicitly declined to base the award on Civil Rule 79, this court may affirm the judgment on any appropriate ground, even if it is a ground which was rejected by the trial court." (citing *State v. Alaska Land Title Ass'n*, 667 P.2d 714, 725 (Alaska 1983); *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961))).

efforts were excused" under the statute. Kylie argues that if subsection (c)(7) "applies in this case — not a case at the margins of parent conduct . . . — then [the statute] will apply in every CINA case involving domestic violence (whether the parent is the perpetrator or, like Kylie, the victim)."

We first note that AS 47.10.086(c) does not exist to absolve OCS's failure to execute its responsibilities in routine interventions; it is intended to operate as a safety valve, permitting courts to excuse — in the best interests of the child[28] — remedial efforts if extraordinary circumstances or the parent's egregious conduct would render those efforts pro forma or, more importantly, endanger the child's welfare.[29] And second, although OCS is correct that we "may affirm . . . on any appropriate ground,"[30] it is prudent to avoid doing so when alternative grounds would require us to enter discretionary rulings best committed to the sound judgment of the trial court, which will generally be much more intimately familiar with the parties and the case.[31] A finding that

---

[28]     *See* AS 47.10.086(f) ("In making determinations and reasonable efforts under this section, the primary consideration is the child's best interests.").

[29]     *See Vivian P.*, 78 P.3d at 708 (noting AS 47.10.086(c)(1) was "designed to eliminate remedial requirements in extreme circumstances" (citing *J.S. v. State*, 50 P.3d 388, 392 & n.13 (Alaska 2002))).

[30]     *Torrey*, 872 P.2d at 188 (citing *Alaska Land Title Ass'n*, 667 P.2d at 725; *Ransom*, 362 P.2d at 285).

[31]     *See Snyder v. Am. Legion Spenard Post No. 28*, 119 P.3d 996, 1001 (Alaska 2005) ("The rule that an appellate court may affirm a judgment on any ground supported by the record regardless of whether the ground was relied on by the trial court should not ordinarily extend to discretionary rulings that the court might properly have declined to make. But where it is clear that the court would have exercised its discretion in a manner that upholds the judgment, we believe that an appellate court can properly apply the rule."); *see also Moira M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 370 P.3d 595, 602 (Alaska 2016) ("[T]he statutory scheme recognizes the
(continued...)

reasonable efforts are not required under AS 47.10.086(c) is just such a discretionary ruling. The statute permits trial courts to excuse reasonable efforts when one of the enumerated bases applies, but it does not require them to do so.[32] We leave it for the trial court to first consider statutory exceptions to OCS's reasonable efforts requirement, if requested.

## V.    CONCLUSION

We REVERSE and VACATE the trial court's order terminating Kylie's parental rights. We REMAND for reconsideration of the trial court's order denying Kylie further visitation and for further proceedings consistent with this order.

---

[31]    (...continued)
superior court's role in determining whether OCS may cease making reasonable efforts." (citing AS 47.10.086(b)-(c))); *cf. Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1039 (Alaska 2008) ("Although an appellate court may affirm a grant of summary judgment based on any grounds appearing in the record, this power is discretionary." (citing *Snyder*, 119 P.3d at 1001)).

[32]    *See* AS 47.10.086(c) ("The court *may* determine that reasonable efforts . . . are not required" (emphasis added)).